# ARKANSAS EDUCATIONAL TELEVISION COMMISSION *v.* FORBES

No. 96–779.   Argued October 8, 1997—Decided May 18, 1998

KENNEDY, J., delivered the opinion of the Court, in which REHN-QUIST, C. J., and O'CONNOR, SCALIA, THOMAS, and BREYER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER and GINS-BURG, JJ., joined, *post*, p. 683.

*Richard D. Marks* argued the cause for petitioner. With him on the briefs was *Alden L. Atkins.*

*Deputy Solicitor General Wallace* argued the cause for the Federal Communications Commission et al. as *amici curiae* urging reversal. With him on the briefs were *Acting Solicitor General Dellinger, Jonathan E. Nuechterlein, William E. Kennard, Christopher J. Wright, Daniel M. Armstrong,* and *C. Grey Pash, Jr.*

*Kelly Shackelford* argued the cause for respondent. With him on the briefs was *John W. Whitehead.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of California et al. by *Daniel E. Lungren,* Attorney General of California, *Roderick E. Walston,* Chief Assistant Attorney General, *Charles W. Getz IV,* Assistant Attorney General, *Edna Walz,* Deputy Attorney General, and *Daniel Schweitzer,* and by the Attorneys General for their respective States as follows: *William H. Pryor, Jr.,* of Alabama, *Grant Woods* of Arizona, *Gale A. Norton* of Colorado, *Robert A. Butterworth* of Florida, *Michael J. Bowers* of Georgia, *Alan G. Lance* of Idaho, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Philip T. McLaughlin* of New Hampshire, *Michael F. Easley* of North Carolina, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *William H. Sorrell* of Vermont, and *William U. Hill* of Wyoming; for the City of New York by *Paul A. Crotty* and *Leonard J. Koerner;* for the Association of America's Public Television

JUSTICE KENNEDY delivered the opinion of the Court.

A state-owned public television broadcaster sponsored a candidate debate from which it excluded an independent candidate with little popular support. The issue before us is whether, by reason of its state ownership, the station had a constitutional obligation to allow every candidate access to the debate. We conclude that, unlike most other public television programs, the candidate debate was subject to constitutional constraints applicable to nonpublic fora under our forum precedents. Even so, the broadcaster's decision to exclude the candidate was a reasonable, viewpoint-neutral exercise of journalistic discretion.

## I

Petitioner, the Arkansas Educational Television Commission (AETC), is an Arkansas state agency owning and operating a network of five noncommercial television stations (Arkansas Educational Television Network or AETN). The eight members of AETC are appointed by the Governor for 8-year terms and are removable only for good cause. Ark. Code Ann. §§ 6–3–102(a)(1), (b)(1) (Supp. 1997), § 25–16–804(b)(1) (1996). AETC members are barred from holding any other state or federal office, with the exception of teach-

Stations et al. by *E. Barrett Prettyman, Jr.,* and *Robert Corn-Revere;* and for the Commission on Presidential Debates by *Lewis K. Loss* and *William H. Briggs, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Marjorie Heins* and *Steven R. Shapiro;* for the Brennan Center for Justice at New York University School of Law by *Philip Allen Lacovara;* for Greens/Green Party USA by *John C. Klotz;* for Eugene McCarthy et al. by *Arthur D. Goldstein;* for the Natural Law Party of the United States by *Jay B. Marcus;* for the Pacific Legal Foundation by *Sharon L. Browne* and *Deborah J. La Fetra;* and for Perot '96 by *Jamin B. Raskin* and *R. Clayton Mulford.*

*Peter Verniero,* Attorney General, and *Joseph L. Yannotti,* Assistant Attorney General, filed a brief for the State of New Jersey as *amicus curiae.*

ing positions. Ark. Code Ann. § 6–3–102(a)(3) (Supp. 1997). To insulate its programming decisions from political pressure, AETC employs an executive director and professional staff who exercise broad editorial discretion in planning the network's programming. AETC has also adopted the Statement of Principles of Editorial Integrity in Public Broadcasting, which counsel adherence to "generally accepted broadcasting industry standards, so that the programming service is free from pressure from political or financial supporters." App. to Pet. for Cert. 82a.

In the spring of 1992, AETC staff began planning a series of debates between candidates for federal office in the November 1992 elections. AETC decided to televise a total of five debates, scheduling one for the Senate election and one for each of the four congressional elections in Arkansas. Working in close consultation with Bill Simmons, Arkansas Bureau Chief for the Associated Press, AETC staff developed a debate format allowing about 53 minutes during each 1-hour debate for questions to and answers by the candidates. Given the time constraint, the staff and Simmons "decided to limit participation in the debates to the major party candidates or any other candidate who had strong popular support." Record, Affidavit of Bill Simmons ¶ 5.

On June 17, 1992, AETC invited the Republican and Democratic candidates for Arkansas' Third Congressional District to participate in the AETC debate for that seat. Two months later, after obtaining the 2,000 signatures required by Arkansas law, see Ark. Code Ann. § 7–7–103(c)(1) (Supp. 1993), respondent Ralph Forbes was certified as an independent candidate qualified to appear on the ballot for the seat. Forbes was a perennial candidate who had sought, without success, a number of elected offices in Arkansas. On August 24, 1992, he wrote to AETC requesting permission to participate in the debate for his district, scheduled for October 22, 1992. On September 4, AETC Executive Director Susan Howarth denied Forbes' request, explaining that AETC had

"made a bona fide journalistic judgement that our viewers would best be served by limiting the debate" to the candidates already invited. App. 61.

On October 19, 1992, Forbes filed suit against AETC, seeking injunctive and declaratory relief as well as damages. Forbes claimed he was entitled to participate in the debate under both the First Amendment and 47 U. S. C. § 315, which affords political candidates a limited right of access to television air time. Forbes requested a preliminary injunction mandating his inclusion in the debate. The District Court denied the request, as did the United States Court of Appeals for the Eighth Circuit. The District Court later dismissed Forbes' action for failure to state a claim.

Sitting en banc, the Court of Appeals affirmed the dismissal of Forbes' statutory claim, holding that he had failed to exhaust his administrative remedies. The court reversed, however, the dismissal of Forbes' First Amendment claim. Observing that AETC is a state actor, the court held Forbes had "a qualified right of access created by AETN's sponsorship of a debate, and that AETN must have [had] a legitimate reason to exclude him strong enough to survive First Amendment scrutiny." *Forbes* v. *Arkansas Ed. Television Network Foundation*, 22 F. 3d 1423, 1428 (CA8), cert. denied, 513 U. S. 995 (1994), 514 U. S. 1110 (1995). Because AETC had not yet filed an answer to Forbes' complaint, it had not given any reason for excluding him from the debate, and the Court of Appeals remanded the action for further proceedings.

On remand, the District Court found as a matter of law that the debate was a nonpublic forum, and the issue became whether Forbes' views were the reason for his exclusion. At trial, AETC professional staff testified Forbes was excluded because he lacked any campaign organization, had not generated appreciable voter support, and was not regarded as a serious candidate by the press covering the election. The jury made express findings that AETC's decision to ex-

clude Forbes had not been influenced by political pressure or disagreement with his views. The District Court entered judgment for AETC.

The Court of Appeals again reversed. The court acknowledged that AETC's decision to exclude Forbes "was made in good faith" and was "exactly the kind of journalistic judgment routinely made by newspeople." 93 F. 3d 497, 505 (CA8 1996). The court asserted, nevertheless, that AETC had "opened its facilities to a particular group—candidates running for the Third District Congressional seat." *Id.*, at 504. AETC's action, the court held, made the debate a public forum, to which all candidates "legally qualified to appear on the ballot" had a presumptive right of access. *Ibid.* Applying strict scrutiny, the court determined that AETC's assessment of Forbes' "political viability" was neither a "compelling nor [a] narrowly tailored" reason for excluding him from the debate. *Id.*, at 504–505.

A conflict with the decision of the United States Court of Appeals for the Eleventh Circuit in *Chandler* v. *Georgia Public Telecommunications Comm'n*, 917 F. 2d 486 (1990), cert. denied, 502 U. S. 816 (1991), together with the manifest importance of the case, led us to grant certiorari. 520 U. S. 1114 (1997). We now reverse.

II

Forbes has long since abandoned his statutory claims under 47 U. S. C. § 315, and so the issue is whether his exclusion from the debate was consistent with the First Amendment. The Court of Appeals held it was not, applying our public forum precedents. Appearing as *amicus curiae* in support of petitioner, the United States argues that our forum precedents should be of little relevance in the context of television broadcasting. At the outset, then, it is instructive to ask whether public forum principles apply to the case at all.

Having first arisen in the context of streets and parks, the public forum doctrine should not be extended in a mechanical

way to the very different context of public television broadcasting. In the case of streets and parks, the open access and viewpoint neutrality commanded by the doctrine is "compatible with the intended purpose of the property." *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 49 (1983). So too was the requirement of viewpoint neutrality compatible with the university's funding of student publications in *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995). In the case of television broadcasting, however, broad rights of access for outside speakers would be antithetical, as a general rule, to the discretion that stations and their editorial staff must exercise to fulfill their journalistic purpose and statutory obligations.

Congress has rejected the argument that "broadcast facilities should be open on a nonselective basis to all persons wishing to talk about public issues." *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94, 105 (1973). Instead, television broadcasters enjoy the "widest journalistic freedom" consistent with their public responsibilities. *Id.*, at 110; *FCC* v. *League of Women Voters of Cal.*, 468 U. S. 364, 378 (1984). Among the broadcaster's responsibilities is the duty to schedule programming that serves the "public interest, convenience, and necessity." 47 U. S. C. § 309(a). Public and private broadcasters alike are not only permitted, but indeed required, to exercise substantial editorial discretion in the selection and presentation of their programming.

As a general rule, the nature of editorial discretion counsels against subjecting broadcasters to claims of viewpoint discrimination. Programming decisions would be particularly vulnerable to claims of this type because even principled exclusions rooted in sound journalistic judgment can often be characterized as viewpoint based. To comply with their obligation to air programming that serves the public interest, broadcasters must often choose among speakers expressing different viewpoints. "That editors—newspaper or broadcast—can and do abuse this power is beyond doubt,"

*Columbia Broadcasting System, Inc.*, 412 U. S., at 124; but "[c]alculated risks of abuse are taken in order to preserve higher values." *Id.*, at 125. Much like a university selecting a commencement speaker, a public institution selecting speakers for a lecture series, or a public school prescribing its curriculum, a broadcaster by its nature will facilitate the expression of some viewpoints instead of others. Were the judiciary to require, and so to define and approve, pre-established criteria for access, it would risk implicating the courts in judgments that should be left to the exercise of journalistic discretion.

When a public broadcaster exercises editorial discretion in the selection and presentation of its programming, it engages in speech activity. Cf. *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 636 (1994) ("Through 'original programming or by exercising editorial discretion over which stations or programs to include in its repertoire,' cable programmers and operators 'see[k] to communicate messages on a wide variety of topics and in a wide variety of formats'") (quoting *Los Angeles* v. *Preferred Communications, Inc.*, 476 U. S. 488, 494 (1986)). Although programming decisions often involve the compilation of the speech of third parties, the decisions nonetheless constitute communicative acts. See *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 570 (1995) (a speaker need not "generate, as an original matter, each item featured in the communication").

Claims of access under our public forum precedents could obstruct the legitimate purposes of television broadcasters. Were the doctrine given sweeping application in this context, courts "would be required to oversee far more of the day-to-day operations of broadcasters' conduct, deciding such questions as whether a particular individual or group has had sufficient opportunity to present its viewpoint and whether a particular viewpoint has already been sufficiently aired." *Columbia Broadcasting System, Inc., supra*, at 127. "The

result would be a further erosion of the journalistic discretion of broadcasters," transferring "control over the treatment of public issues from the licensees who are accountable for broadcast performance to private individuals" who bring suit under our forum precedents. 412 U. S., at 124. In effect, we would "exchange 'public trustee' broadcasting, with all its limitations, for a system of self-appointed editorial commentators." *Id.*, at 125.

In the absence of any congressional command to "[r]egimen[t] broadcasters" in this manner, *id.*, at 127, we are disinclined to do so through doctrines of our own design. This is not to say the First Amendment would bar the legislative imposition of neutral rules for access to public broadcasting. Instead, we say that, in most cases, the First Amendment of its own force does not compel public broadcasters to allow third parties access to their programming.

Although public broadcasting as a general matter does not lend itself to scrutiny under the forum doctrine, candidate debates present the narrow exception to the rule. For two reasons, a candidate debate like the one at issue here is different from other programming. First, unlike AETC's other broadcasts, the debate was by design a forum for political speech by the candidates. Consistent with the long tradition of candidate debates, the implicit representation of the broadcaster was that the views expressed were those of the candidates, not its own. The very purpose of the debate was to allow the candidates to express their views with minimal intrusion by the broadcaster. In this respect the debate differed even from a political talk show, whose host can express partisan views and then limit the discussion to those ideas.

Second, in our tradition, candidate debates are of exceptional significance in the electoral process. "[I]t is of particular importance that candidates have the . . . opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their

positions on vital public issues before choosing among them on election day." *CBS, Inc.* v. *FCC,* 453 U. S. 367, 396 (1981) (internal quotation marks omitted). Deliberation on the positions and qualifications of candidates is integral to our system of government, and electoral speech may have its most profound and widespread impact when it is disseminated through televised debates. A majority of the population cites television as its primary source of election information, and debates are regarded as the "only occasion during a campaign when the attention of a large portion of the American public is focused on the election, as well as the only campaign information format which potentially offers sufficient time to explore issues and policies in depth in a neutral forum." Congressional Research Service, Campaign Debates in Presidential General Elections, summ. (June 15, 1993).

As we later discuss, in many cases it is not feasible for the broadcaster to allow unlimited access to a candidate debate. Yet the requirement of neutrality remains; a broadcaster cannot grant or deny access to a candidate debate on the basis of whether it agrees with a candidate's views. Viewpoint discrimination in this context would present not a "[c]alculated ris[k]," *Columbia Broadcasting System, Inc.,* *supra,* at 125, but an inevitability of skewing the electoral dialogue.

The special characteristics of candidate debates support the conclusion that the AETC debate was a forum of some type. The question of what type must be answered by reference to our public forum precedents, to which we now turn.

### III

Forbes argues, and the Court of Appeals held, that the debate was a public forum to which he had a First Amendment right of access. Under our precedents, however, the debate was a nonpublic forum, from which AETC could exclude Forbes in the reasonable, viewpoint-neutral exercise of its journalistic discretion.

## A

For our purposes, it will suffice to employ the categories of speech fora already established and discussed in our cases. "[T]he Court [has] identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 802 (1985). Traditional public fora are defined by the objective characteristics of the property, such as whether, "by long tradition or by government fiat," the property has been "devoted to assembly and debate." *Perry Ed. Assn.*, 460 U. S., at 45. The government can exclude a speaker from a traditional public forum "only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius, supra*, at 800.

Designated public fora, in contrast, are created by purposeful governmental action. "The government does not create a [designated] public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional public forum for public discourse." 473 U. S., at 802; accord, *International Soc. for Krishna Consciousness, Inc.* v. *Lee*, 505 U. S. 672, 678 (1992) *(ISKCON)* (designated public forum is "property that the State has opened for expressive activity by part or all of the public"). Hence "the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Cornelius*, 473 U. S., at 802. If the government excludes a speaker who falls within the class to which a designated public forum is made generally available, its action is subject to strict scrutiny. *Ibid.; United States* v. *Kokinda*, 497 U. S. 720, 726–727 (1990) (plurality opinion of O'CONNOR, J.).

Other government properties are either nonpublic fora or not fora at all. *ISKCON, supra*, at 678–679. The government can restrict access to a nonpublic forum "as long

as the restrictions are reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius, supra,* at 800 (internal quotation marks omitted).

In summary, traditional public fora are open for expressive activity regardless of the government's intent. The objective characteristics of these properties require the government to accommodate private speakers. The government is free to open additional properties for expressive use by the general public or by a particular class of speakers, thereby creating designated public fora. Where the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a nonpublic forum or not a forum at all.

## B

The parties agree the AETC debate was not a traditional public forum. The Court has rejected the view that traditional public forum status extends beyond its historic confines, see *ISKCON,* 505 U. S., at 680–681; and even had a more expansive conception of traditional public fora been adopted, see, *e. g., id.,* at 698–699 (KENNEDY, J., concurring in judgments), the almost unfettered access of a traditional public forum would be incompatible with the programming dictates a television broadcaster must follow. See *supra,* at 673–675. The issue, then, is whether the debate was a designated public forum or a nonpublic forum.

Under our precedents, the AETC debate was not a designated public forum. To create a forum of this type, the government must intend to make the property "generally available," *Widmar* v. *Vincent,* 454 U. S. 263, 264 (1981), to a class of speakers. Accord, *Cornelius, supra,* at 802. In *Widmar,* for example, a state university created a public forum for registered student groups by implementing a policy that expressly made its meeting facilities "generally open" to such groups. 454 U. S., at 267; accord, *Perry, supra,* at 45 (desig-

nated public forum is "generally open"). A designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers. In *Perry*, for example, the Court held a school district's internal mail system was not a designated public forum even though selected speakers were able to gain access to it. The basis for the holding in *Perry* was explained by the Court in *Cornelius:*

> "In contrast to the general access policy in *Widmar*, school board policy did not grant general access to the school mail system. The practice was to require permission from the individual school principal before access to the system to communicate with teachers was granted." 473 U. S., at 803.

And in *Cornelius* itself, the Court held the Combined Federal Campaign (CFC) charity drive was not a designated public forum because "[t]he Government's consistent policy ha[d] been to limit participation in the CFC to 'appropriate' [*i. e.*, charitable rather than political] voluntary agencies and to require agencies seeking admission to obtain permission from federal and local Campaign officials." *Id.*, at 804.

These cases illustrate the distinction between "general access," *id.*, at 803, which indicates the property is a designated public forum, and "selective access," *id.*, at 805, which indicates the property is a nonpublic forum. On one hand, the government creates a designated public forum when it makes its property generally available to a certain class of speakers, as the university made its facilities generally available to student groups in *Widmar*. On the other hand, the government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, "obtain permission," 473 U. S., at 804, to use it. For instance, the Federal Government did not create a designated public forum in *Cornelius*

when it reserved eligibility for participation in the CFC drive to charitable agencies, and then made individual, non-ministerial judgments as to which of the eligible agencies would participate. *Ibid.*

The *Cornelius* distinction between general and selective access furthers First Amendment interests. By recognizing the distinction, we encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all. That this distinction turns on governmental intent does not render it unprotective of speech. Rather, it reflects the reality that, with the exception of traditional public fora, the government retains the choice of whether to designate its property as a forum for specified classes of speakers.

Here, the debate did not have an open-microphone format. Contrary to the assertion of the Court of Appeals, AETC did not make its debate generally available to candidates for Arkansas' Third Congressional District seat. Instead, just as the Federal Government in *Cornelius* reserved eligibility for participation in the CFC program to certain classes of voluntary agencies, AETC reserved eligibility for participation in the debate to candidates for the Third Congressional District seat (as opposed to some other seat). At that point, just as the Government in *Cornelius* made agency-by-agency determinations as to which of the eligible agencies would participate in the CFC, AETC made candidate-by-candidate determinations as to which of the eligible candidates would participate in the debate. "Such selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum." *Id.*, at 805. Thus the debate was a nonpublic forum.

In addition to being a misapplication of our precedents, the Court of Appeals' holding would result in less speech, not more. In ruling that the debate was a public forum open to all ballot-qualified candidates, 93 F. 3d, at 504, the Court of Appeals would place a severe burden upon public broadcast-

ers who air candidates' views. In each of the 1988, 1992, and 1996 Presidential elections, for example, no fewer than 19 candidates appeared on the ballot in at least one State. See Twentieth Century Fund Task Force on Presidential Debates, Let America Decide 148 (1995); Federal Election Commission, Federal Elections 92, p. 9 (1993); Federal Election Commission, Federal Elections 96, p. 11 (1997). In the 1996 congressional elections, it was common for 6 to 11 candidates to qualify for the ballot for a particular seat. See 1996 Election Results, 54 Congressional Quarterly Weekly Report 3250–3257 (1996). In the 1993 New Jersey gubernatorial election, to illustrate further, sample ballot mailings included the written statements of 19 candidates. See N. Y. Times, Sept. 11, 1993, section 1, p. 26, col. 5. On logistical grounds alone, a public television editor might, with reason, decide that the inclusion of all ballot-qualified candidates would "actually undermine the educational value and quality of debates." Let America Decide, *supra,* at 148.

Were it faced with the prospect of cacophony, on the one hand, and First Amendment liability, on the other, a public television broadcaster might choose not to air candidates' views at all. A broadcaster might decide " 'the safe course is to avoid controversy,' . . . and by so doing diminish the free flow of information and ideas." *Turner Broadcasting System, Inc.,* 512 U. S., at 656 (quoting *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241, 257 (1974)). In this circumstance, a "[g]overnment-enforced right of access inescapably 'dampens the vigor and limits the variety of public debate.' " *Ibid.* (quoting *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 279 (1964)).

These concerns are more than speculative. As a direct result of the Court of Appeals' decision in this case, the Nebraska Educational Television Network canceled a scheduled debate between candidates in Nebraska's 1996 United States Senate race. See Lincoln Journal Star, Aug. 24, 1996,

p. 1A, col. 6. A First Amendment jurisprudence yielding these results does not promote speech but represses it.

## C

The debate's status as a nonpublic forum, however, did not give AETC unfettered power to exclude any candidate it wished. As JUSTICE O'CONNOR has observed, nonpublic forum status "does not mean that the government can restrict speech in whatever way it likes." *ISKCON*, 505 U. S., at 687. To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property. *Cornelius*, 473 U. S., at 800.

In this case, the jury found Forbes' exclusion was not based on "objections or opposition to his views." App. to Pet. for Cert. 23a. The record provides ample support for this finding, demonstrating as well that AETC's decision to exclude him was reasonable. AETC Executive Director Susan Howarth testified Forbes' views had "absolutely" no role in the decision to exclude him from the debate. App. 142. She further testified Forbes was excluded because (1) "the Arkansas voters did not consider him a serious candidate"; (2) "the news organizations also did not consider him a serious candidate"; (3) "the Associated Press and a national election result reporting service did not plan to run his name in results on election night"; (4) Forbes "apparently had little, if any, financial support, failing to report campaign finances to the Secretary of State's office or to the Federal Election Commission"; and (5) "there [was] no 'Forbes for Congress' campaign headquarters other than his house." *Id.*, at 126–127. Forbes himself described his campaign organization as "bedlam" and the media coverage of his campaign as "zilch." *Id.*, at 91, 96. It is, in short, beyond dispute that Forbes was excluded not because of his viewpoint but because he had generated no appreciable public interest.

Cf. *Perry*, 460 U. S., at 49 (exclusion from nonpublic forum "based on the *status*" rather than the views of the speaker is permissible (emphasis in original)).

There is no substance to Forbes' suggestion that he was excluded because his views were unpopular or out of the mainstream. His own objective lack of support, not his platform, was the criterion. Indeed, the very premise of Forbes' contention is mistaken. A candidate with unconventional views might well enjoy broad support by virtue of a compelling personality or an exemplary campaign organization. By the same token, a candidate with a traditional platform might enjoy little support due to an inept campaign or any number of other reasons.

Nor did AETC exclude Forbes in an attempted manipulation of the political process. The evidence provided powerful support for the jury's express finding that AETC's exclusion of Forbes was not the result of "political pressure from anyone inside or outside [AETC]." App. to Pet. for Cert. 22a. There is no serious argument that AETC did not act in good faith in this case. AETC excluded Forbes because the voters lacked interest in his candidacy, not because AETC itself did.

The broadcaster's decision to exclude Forbes was a reasonable, viewpoint-neutral exercise of journalistic discretion consistent with the First Amendment. The judgment of the Court of Appeals is

*Reversed.*

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, dissenting.

The Court has decided that a state-owned television network has no "constitutional obligation to allow every candidate access to" political debates that it sponsors. *Ante*, at 669. I do not challenge that decision. The judgment of the Court of Appeals should nevertheless be affirmed. The official action that led to the exclusion of respondent Forbes

from a debate with the two major-party candidates for election to one of Arkansas' four seats in Congress does not adhere to well-settled constitutional principles. The ad hoc decision of the staff of the Arkansas Educational Television Commission (AETC) raises precisely the concerns addressed by "the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 150–151 (1969).

In its discussion of the facts, the Court barely mentions the standardless character of the decision to exclude Forbes from the debate. In its discussion of the law, the Court understates the constitutional importance of the distinction between state ownership and private ownership of broadcast facilities. I shall therefore first add a few words about the record in this case and the history of regulation of the broadcast media, before explaining why I believe the judgment should be affirmed.

I

Two months before Forbes was officially certified as an independent candidate qualified to appear on the ballot under Arkansas law,[1] the AETC staff had already concluded that he "should not be invited" to participate in the televised debates because he was "not a serious candidate as determined by the voters of Arkansas."[2] He had, however, been a serious contender for the Republican nomination for Lieutenant Governor in 1986 and again in 1990. Although he was defeated in a runoff election, in the three-way primary race conducted in 1990—just two years before the AETC staff decision—he had received 46.88% of the statewide vote and

---

[1] See Ark. Code Ann. § 7–7–103(c)(1) (Supp. 1993).

[2] Record, Letter to Carole Adornetto from Amy Oliver Barnes dated June 19, 1992, attached as Exh. 2 to Affidavit of Amy Oliver Barnes.

had carried 15 of the 16 counties within the Third Congressional District by absolute majorities. Nevertheless, the staff concluded that Forbes did not have "strong popular support." Record, Affidavit of Bill Simmons ¶ 5.[3]

Given the fact that the Republican winner in the Third Congressional District race in 1992 received only 50.22% of the vote and the Democrat received 47.20%,[4] it would have been necessary for Forbes, who had made a strong showing in recent Republican primaries, to divert only a handful of votes from the Republican candidate to cause his defeat. Thus, even though the AETC staff may have correctly concluded that Forbes was "not a serious candidate," their decision to exclude him from the debate may have determined the outcome of the election in the Third District.

If a comparable decision were made today by a privately owned network, it would be subject to scrutiny under the Federal Election Campaign Act of 1971[5] unless the network used "pre-established objective criteria to determine which candidates may participate in [the] debate." 11 CFR § 110.13(c) (1997). No such criteria governed AETC's refusal to permit Forbes to participate in the debate. Indeed, whether that refusal was based on a judgment about "newsworthiness"—as AETC has argued in this Court—or a judgment about "political viability"—as it argued in the Court of Appeals—the facts in the record presumably would have

---

[3] Simmons, a journalist working with the AETC staff on the debates, stated that "[a]t the time this decision [to invite only candidates with strong popular support] was made . . . , there were no third party or non-party candidates to evaluate as to the likely extent of their popular support." Record, Affidavit of Bill Simmons ¶ 5. Presumably Simmons meant that there was no other ballot-qualified candidate, because an AETC staff member, Amy Oliver, represented that there was consideration about whether to invite Forbes before he qualified as a candidate. See text accompanying n. 2, *supra*.

[4] See App. 172.

[5] See 2 U. S. C. § 441b(a); see also *Perot* v. *FEC*, 97 F. 3d 553, 556 (CADC 1996), cert. denied *sub nom. Hagelin* v. *FEC*, 520 U. S. 1210 (1997).

provided an adequate basis either for a decision to include Forbes in the Third District debate or a decision to exclude him, and might even have required a cancellation of two of the other debates.[6]

The apparent flexibility of AETC's purported standard suggests the extent to which the staff had nearly limitless discretion to exclude Forbes from the debate based on ad hoc justifications. Thus, the Court of Appeals correctly concluded that the staff's appraisal of "political viability" was "so subjective, so arguable, so susceptible of variation in individual opinion, as to provide no secure basis for the exercise of governmental power consistent with the First Amendment." *Forbes* v. *Arkansas Educational Television Communication Network Foundation*, 93 F. 3d 497, 505 (CA8 1996).

## II

AETC is a state agency whose actions "are fairly attributable to the State and subject to the Fourteenth Amendment, unlike the actions of privately owned broadcast licensees." *Forbes* v. *Arkansas Educational Television Communication Network Foundation*, 22 F. 3d 1423, 1428 (CA8), cert. denied, 513 U. S. 995 (1994), 514 U. S. 1110 (1995). The AETC staff members therefore "were not ordinary journalists: they

---

[6] Although the contest between the major-party candidates in the Third District was a relatively close one, in two of the other three districts in which both major-party candidates had been invited to debate, it was clear that one of them had virtually no chance of winning the election. Democrat Blanche Lambert's resounding victory over Republican Terry Hayes in the First Congressional District illustrates this point: Lambert received 69.8% of the vote compared with Hays' 30.2%. R. Scammon & A. McGillivray, America Votes 20: A Handbook of Contemporary American Election Statistics 99 (1993). Similarly, in the Second District, Democrat Ray Thornton, the incumbent, defeated Republican Dennis Scott and won with 74.2% of the vote. *Ibid.* Note that Scott raised only $6,000, which was less than Forbes raised; nevertheless, Scott was invited to participate in a debate while Forbes was not. See App. 133–134, 175.

were employees of government." 93 F. 3d, at 505. The Court implicitly acknowledges these facts by subjecting the decision to exclude Forbes to constitutional analysis. Yet the Court seriously underestimates the importance of the difference between private and public ownership of broadcast facilities, despite the fact that Congress and this Court have repeatedly recognized that difference.

In *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94 (1973), the Court held that a licensee is neither a common carrier, *id.*, at 107–109, nor a public forum that must accommodate "'the right of every individual to speak, write, or publish,'" *id.*, at 101 (quoting *Red Lion Broadcasting Co.* v. *FCC*, 395 U. S. 367, 388 (1969)). Speaking for a plurality, Chief Justice Burger expressed the opinion that the First Amendment imposes no constraint on the private network's journalistic freedom. He supported that view by noting that when Congress confronted the advent of radio in the 1920's, it "was faced with a fundamental choice between total Government ownership and control of the new medium—the choice of most other countries—or some other alternative." 412 U. S., at 116.[7]

---

[7] Interestingly, many countries that formerly relied upon state control of broadcast entities appear to be moving in the direction of deregulation and private ownership of such entities. See, *e. g.*, Bughin & Griekspoor, A New Era for European TV, 3 McKinsey Q. 90, 92–93 (1997) ("Most of Western Europe's public television broadcasters began to lose their grip on the market in the mid-1980s. Only Switzerland, Austria, and Ireland continue to operate state television monopolies . . . . In Europe as a whole (including Eastern Europe, where television remains largely state controlled), the number of private broadcasters holding market-leading positions nearly doubled in the first half of this decade"); Rohwedder, Central Europe's Broadcasters Square Off, Wall Street Journal Europe 4 (May 15, 1995) ("Central Europe's government-run television channels, unchallenged media masters in the days of communist control, are coming under increasingly aggressive attack from upstart private broadcasters"); Lange & Woldt, European Interest in the American Experience in Self-Regulation, 13 Cardozo Arts & Ent. L. J. 657, 658 (1995) ("Over the

Congress chose a system of private broadcasters licensed and regulated by the Government, partly because of our traditional respect for private enterprise, but more importantly because public ownership created unacceptable risks of governmental censorship and use of the media for propaganda. "Congress appears to have concluded . . . that of these two choices—private or official censorship—Government censorship would be the most pervasive, the most self-serving, the most difficult to restrain and hence the one most to be avoided." *Id.,* at 105.[8]

While noncommercial, educational stations generally have exercised the same journalistic independence as commercial networks, in 1981 Congress enacted a statute forbidding stations that received a federal subsidy to engage in "editorializing."[9] Relying primarily on cases involving the rights of commercial entities, a bare majority of this Court held the restriction invalid. *FCC* v. *League of Women Voters of Cal.,* 468 U. S. 364 (1984). Responding to the dissenting view that "the interest in keeping the Federal Government out of the propaganda arena" justified the restriction, *id.,* at 415 (opinion of STEVENS, J.), the majority emphasized the broad coverage of the statute and concluded that it "impermissibly sweeps within its prohibition a wide range

last ten years, in Germany and many other European countries, public broadcasting has been weakened by competition from private television channels").

[8] The Court considered then-Secretary of Commerce Herbert Hoover's statement to a House committee expressing concern about government involvement in broadcasting:

"'We can not allow any single person or group to place themselves in [a] position where they can censor the material which shall be broadcasted to the public, nor do I believe that the Government should ever be placed in the position of censoring this material.'" 412 U. S., at 104 (quoting Hearings on H. R. 7357 before the House Committee on the Merchant Marine and Fisheries, 68th Cong., 1st Sess., 8 (1924)).

[9] Public Broadcasting Amendments of 1981, Pub. L. 97–35, 95 Stat. 730, amending § 399 of the Public Broadcasting Act of 1967, Pub. L. 90–129, 81 Stat. 365, 47 U. S. C. § 390 *et seq.*

of speech by wholly private stations on topics that . . . have nothing whatever to do with federal, state, or local government." *Id.*, at 395. The Court noted that Congress had considered and rejected a ban that would have applied only to stations operated by state or local governmental entities, and reserved decision on the constitutionality of such a limited ban. See *id.*, at 394, n. 24.

The *League of Women Voters* case implicated the right of "wholly private stations" to express their own views on a wide range of topics that "have nothing whatever to do with . . . government." *Id.*, at 395. The case before us today involves only the right of a state-owned network to regulate speech that plays a central role in democratic government. Because AETC is owned by the State, deference to its interest in making ad hoc decisions about the political content of its programs necessarily increases the risk of government censorship and propaganda in a way that protection of privately owned broadcasters does not.

## III

The Court recognizes that the debates sponsored by AETC were "by design a forum for political speech by the candidates." *Ante*, at 675. The Court also acknowledges the central importance of candidate debates in the electoral process. See *ibid.* Thus, there is no need to review our cases expounding on the public forum doctrine to conclude that the First Amendment will not tolerate a state agency's arbitrary exclusion from a debate forum based, for example, on an expectation that the speaker might be critical of the Governor, or might hold unpopular views about abortion or the death penalty. Indeed, the Court so holds today.[10]

---

[10] The Court correctly rejects the extreme position that the First Amendment simply has no application to a candidate's claim that he or she should be permitted to participate in a televised debate. See Brief for FCC et al. as *Amici Curiae* 14 ("The First Amendment does not constrain the editorial choices of state-entity public broadcasters licensed

It seems equally clear, however, that the First Amendment will not tolerate arbitrary definitions of the scope of the forum. We have recognized that "[o]nce it has opened a limited forum, . . . the State must respect the lawful boundaries it has itself set." *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819, 829 (1995). It follows, of course, that a State's failure to set any meaningful boundaries at all cannot insulate the State's action from First Amendment challenge. The dispositive issue in this case, then, is not whether AETC created a designated public forum or a nonpublic forum, as the Court concludes, but whether AETC defined the contours of the debate forum with sufficient specificity to justify the exclusion of a ballot-qualified candidate.

AETC asks that we reject Forbes' constitutional claim on the basis of entirely subjective, ad hoc judgments about the dimensions of its forum.[11] The First Amendment demands more, however, when a state government effectively wields the power to eliminate a political candidate from all consideration by the voters. All stations must act as editors, see *ante*, at 673, and when state-owned stations participate in the broadcasting arena, their editorial decisions may impact the constitutional interests of individual speakers.[12] A state-owned broadcaster need not plan, sponsor, and conduct political debates, however. When it chooses to do so, the First Amendment imposes important limitations on its control over access to the debate forum.

AETC's control was comparable to that of a local government official authorized to issue permits to use public facilities for expressive activities. In cases concerning ac-

---

to operate under the Communications Act"); see also Brief for State of California et al. as *Amici Curiae* 4 ("In its role as speaker, rather than mere forum provider, the state actor is not restricted by speaker-inclusive and viewpoint-neutral rules").

[11] See *supra*, at 685–686.

[12] See n. 17, *infra*.

cess to a traditional public forum, we have found an analogy between the power to issue permits and the censorial power to impose a prior restraint on speech. Thus, in our review of an ordinance requiring a permit to participate in a parade on city streets, we explained that the ordinance, as written, "fell squarely within the ambit of the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth,* 394 U. S., at 150–151.

We recently reaffirmed this approach when considering the constitutionality of an assembly and parade ordinance that authorized a county official to exercise discretion in setting the amount of the permit fee. In *Forsyth County* v. *Nationalist Movement,* 505 U. S. 123 (1992), relying on *Shuttlesworth* and similar cases,[13] we described the breadth of the administrator's discretion thusly:

> "There are no articulated standards either in the ordinance or in the county's established practice. The administrator is not required to rely on any objective factors. He need not provide any explanation for his decision, and that decision is unreviewable. Nothing in the law or its application prevents the official from encouraging some views and discouraging others through the arbitrary application of fees. The First Amendment prohibits the vesting of such unbridled discretion in a government official." 505 U. S., at 133 (footnotes omitted).

---

[13] After citing *Shuttlesworth,* we explained: "The reasoning is simple: If the permit scheme 'involves appraisal of facts, the exercise of judgment, and the formation of an opinion,' *Cantwell* v. *Connecticut,* 310 U. S. 296, 305 (1940), by the licensing authority, 'the danger of censorship and of abridgment of our precious First Amendment freedoms is too great' to be permitted, *Southeastern Promotions, Ltd.* v. *Conrad,* 420 U. S. 546, 553 (1975)." 505 U. S., at 131.

Perhaps the discretion of the AETC staff in controlling access to the 1992 candidate debates was not quite as unbridled as that of the Forsyth County administrator. Nevertheless, it was surely broad enough to raise the concerns that controlled our decision in that case. No written criteria cabined the discretion of the AETC staff. Their subjective judgment about a candidate's "viability" or "newsworthiness" allowed them wide latitude either to permit or to exclude a third participant in any debate.[14] Moreover, in exercising that judgment they were free to rely on factors that arguably should favor inclusion as justifications for exclusion. Thus, the fact that Forbes had little financial support was considered as evidence of his lack of viability when that factor might have provided an independent reason for allowing him to share a free forum with wealthier candidates.[15]

The televised debate forum at issue in this case may not squarely fit within our public forum analysis,[16] but its importance cannot be denied. Given the special character of political speech, particularly during campaigns for elected office,

---

[14] It is particularly troubling that AETC excluded the only independent candidate but invited all the major-party candidates to participate in the planned debates, regardless of their chances of electoral success. See n. 6, *supra.* As this Court has recognized, "political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream." *Anderson* v. *Celebrezze,* 460 U. S. 780, 794 (1983) (citing *Illinois Bd. of Elections* v. *Socialist Workers Party,* 440 U. S. 173, 186 (1979)).

[15] Lack of substantial financial support apparently was not a factor in the decision to invite a major-party candidate with even less financial support than Forbes. See n. 6, *supra.*

[16] Indeed, a plurality of the Court recently has expressed reluctance about applying public forum analysis to new and changing contexts. See *Denver Area Ed. Telecommunications Consortium, Inc.* v. *FCC,* 518 U. S. 727, 741, 749 (1996) (plurality opinion) ("[I]t is not at all clear that the public forum doctrine should be imported wholesale into the area of common carriage regulation").

the debate forum implicates constitutional concerns of the highest order, as the majority acknowledges. *Ante*, at 675. Indeed, the planning and management of political debates by state-owned broadcasters raise serious constitutional concerns that are seldom replicated when state-owned television networks engage in other types of programming.[17] We have recognized that "speech concerning public affairs is . . . the essence of self-government." *Garrison* v. *Louisiana*, 379 U. S. 64, 74–75 (1964). The First Amendment therefore "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265, 272 (1971). Surely the Constitution demands at least as much from the government when it takes action that necessarily impacts democratic elections as when local officials issue parade permits.

The reasons that support the need for narrow, objective, and definite standards to guide licensing decisions apply directly to the wholly subjective access decisions made by the staff of AETC.[18] The importance of avoiding arbitrary

---

[17] The Court observes that "in most cases, the First Amendment of its own force does not compel public broadcasters to allow third parties access to their programming." *Ante*, at 675. A rule, such as the one promulgated by the Federal Election Commission, that requires the use of pre-established, objective criteria to identify the candidates who may participate leaves all other programming decisions unaffected. This is not to say that all other programming decisions made by state-owned television networks are immune from attack on constitutional grounds. As long as the State is not itself a "speaker," its decisions, like employment decisions by state agencies and unlike decisions by private actors, must respect the commands of the First Amendment. It is decades of settled jurisprudence that require judicial review of state action that is challenged on First Amendment grounds. See, *e. g., Widmar* v. *Vincent*, 454 U. S. 263 (1981); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995).

[18] Ironically, it is the standardless character of the decision to exclude Forbes that provides the basis for the Court's conclusion that the debates were a nonpublic forum rather than a limited public forum. The Court

or viewpoint-based exclusions from political debates militates strongly in favor of requiring the controlling state agency to use (and adhere to) preestablished, objective criteria to determine who among qualified candidates may participate. When the demand for speaking facilities exceeds supply, the State must "ration or allocate the scarce resources on some acceptable neutral principle." *Rosenberger*, 515 U. S., at 835. A constitutional duty to use objective standards—*i. e.*, "neutral principles"—for determining whether and when to adjust a debate format would impose only a modest requirement that would fall far short of a duty to grant every multiple-party request.[19] Such standards would also have the benefit of providing the public with some assurance that state-owned broadcasters cannot select debate participants on arbitrary grounds.[20]

Like the Court, I do not endorse the view of the Court of Appeals that all candidates who qualify for a position on the ballot are necessarily entitled to access to any state-sponsored debate. I am convinced, however, that the constitutional imperatives that motivated our decisions in cases like *Shuttlesworth* command that access to political debates

---

explains that "[a] designated public forum is not created when the government allows selective access for individual speakers rather than general access for a class of speakers." *Ante*, at 679. If, as AETC claims, it did invite either the entire class of "viable" candidates, or the entire class of "newsworthy" candidates, under the Court's reasoning, it created a designated public forum.

[19] The Court expresses concern that as a direct result of the Court of Appeals' holding that all ballot-qualified candidates have a right to participate in every debate, a state-owned network canceled a 1996 Nebraska debate. *Ante*, at 681. If the Nebraska station had realized that it could have satisfied its First Amendment obligations simply by setting out participation standards before the debate, however, it seems quite unlikely that it would have chosen instead to cancel the debate.

[20] The fact that AETC and other state-owned networks have adopted policy statements emphasizing the importance of shielding programming decisions from political influence, see *ante*, at 670, confirms the significance of the risk that would be minimized by the adoption of objective criteria.

planned and managed by state-owned entities be governed by preestablished, objective criteria. Requiring government employees to set out objective criteria by which they choose which candidates will benefit from the significant media exposure that results from state-sponsored political debates would alleviate some of the risk inherent in allowing government agencies—rather than private entities—to stage candidate debates.

Accordingly, I would affirm the judgment of the Court of Appeals.