RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0246p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

LIBERTARIAN NATIONAL COMMITTEE, INC.; THE LIBERTARIAN PARTY OF KENTUCKY; DAVID PATTERSON,

*Plaintiffs-Appellants*,

*v.*

TERRY HOLIDAY, et al.,

*Defendants-Appellees*.

┐
│
│
│
> No. 17-6216
│
│
│
┘

———————

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 3:14-cv-00063—Gregory F. Van Tatenhove, District Judge.

Argued: July 25, 2018

Decided and Filed: November 2, 2018

Before: BATCHELDER, KETHLEDGE, and WHITE, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Christopher D. Wiest, CHRIS WIEST, ATTORNEY AT LAW, LLC, Cincinnati, Ohio, for Appellants. Christopher W. Brooker, WYATT, TARRANT & COMBS, LLP, Louisville, Kentucky, for Appellees. **ON BRIEF:** Thomas B. Bruns, Cincinnati, Ohio, Robert A. Winter, Jr., Fort Mitchell, Kentucky, for Appellants. Christopher W. Brooker, Deborah H. Patterson, Sean G. Williamson, WYATT, TARRANT & COMBS, LLP, Louisville, Kentucky, for Appellees.

---

**OPINION**

---

KETHLEDGE, Circuit Judge.  In October 2014, Kentucky Educational Television (KET) hosted a debate between the candidates for one of Kentucky's seats in the U.S. Senate.  KET thought it would best serve viewers by giving airtime only to candidates capable of winning the seat.  It therefore limited the debate to candidates who met certain minimal criteria—including, among others, that at least 1 in 10 Kentuckians actually planned to vote for them.  Those criteria excluded David Patterson, the candidate for the Libertarian Party of Kentucky.  Patterson and the Party thereafter challenged the criteria as unconstitutional.  The district court rejected their claims.  So do we.

I.

A.

KET is run by the Kentucky Authority for Educational Television, a state agency.  Since 1975, KET has televised debates between the candidates in various state and federal elections.  Specifically, it invites candidates to discuss their views in an interview format on the program *Kentucky Tonight*.

Until 2014, KET invited any candidate who was legally qualified to appear on the ballot.  That was a low bar—Republican and Democratic candidates need only two signatures to qualify for the primary ballot—so KET has over the years invited some decidedly nonviable candidates to its debates.  In 2012, for example, KET invited a congressional candidate whose sole campaign activity (other than collecting the necessary signatures) was to appear on *Kentucky Tonight*.  And though the election for another House seat that year came down to a close race between two candidates, KET also invited a third candidate, who ultimately won only 2.8% of the vote.

In 2014, Senator Mitch McConnell was up for reelection.  KET decided early that year to limit its debates for that seat to candidates who had a viable chance of winning.  The goal, as

KET officials said in emails and later in depositions, was to improve the debates for viewers. KET first developed criteria for the debates between candidates during the Republican and Democratic primaries. To meet those criteria, a candidate needed only to qualify for the ballot and publicly to express his or her views on three issues.

Senator McConnell and Kentucky Secretary of State Alison Grimes won the Republican and Democratic primaries, respectively. The next day, KET invited them to its debate for the general election. KET officials also began to draft the criteria for that debate, eventually settling on four. The candidate needed to be qualified to appear on the ballot, either because she was the candidate of a political party as defined by Kentucky statute (*e.g.*, the Republican or Democratic nominee), or had collected 5,000 signatures. *See* KRS §§ 118.305, .315. She also needed to have collected at least $100,000 in campaign contributions, to have received at least 10% of the vote in an independent poll, and to maintain a website setting forth her views. KET did not publish these criteria, but did send them to candidates who had indicated that they wanted to participate in the debate.

McConnell and Grimes met these criteria when KET invited them. Others hoping to join the debate needed to meet the criteria by August 15, three days after the deadline to qualify for the ballot. According to KET, that date left enough time to include the names of the debaters in a monthly magazine that KET sent to its viewers.

The Libertarian Party does not meet the statutory requirements of a political party in Kentucky, so its candidate, Patterson, needed 5,000 signatures to qualify for the ballot. Those signatures were apparently hard to come by: the Party had to pay canvassers to collect them, and Patterson qualified for the ballot on August 11, the day before the deadline.

Patterson never asked KET for its debate criteria. By August 15 he had not raised $100,000. (In fact, he raised $0 during his campaign.) Nor had he polled above 10%. Pursuant to its criteria, KET did not invite him to the debate. When on August 16 the Libertarian Party asked whether Patterson would be invited, KET sent the party the criteria and said it had invited only candidates who met them.

B.

About two weeks before the debate, Patterson and the Libertarian Party sued various KET officials, arguing among other things that KET had excluded Patterson because of his views, and asking the district court to order KET to invite him. The court declined, finding that KET had excluded only "non-serious candidates, not viewpoints."

Patterson then sued the same officials again. In addition to his old claims, he alleged that KET's criteria were themselves unconstitutional. Patterson sought money damages from the KET officials under 42 U.S.C. § 1983. The district court consolidated the two cases, granted summary judgment to KET on Patterson's challenges to the criteria, and dismissed his claim against the host of *Kentucky Tonight*, Bill Goodman. The court later granted summary judgment to KET on Patterson's remaining damages claims. This appeal followed.

II.

A.

We review de novo the district court's grant of qualified immunity to KET officials on most of Patterson's damages claims and on his challenges to the criteria themselves. *See Leone v. BMI Refractory Servs., Inc.*, 893 F.3d 359, 361 (6th Cir. 2018).

1.

To overcome that immunity and collect damages from the KET officials, Patterson first must show that they violated a constitutional right. *See Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018). Patterson says their decision not to invite him to the debate pursuant to their criteria violated the First Amendment. The controlling case on that question, both sides agree, is *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998).

There, an independent House candidate, Ralph Forbes—who had obtained enough signatures to appear on the ballot—asked Arkansas's public television station to allow him to participate in its debate. The station declined; in its view, Forbes had failed to establish himself as a serious candidate. *See id.* at 671. The Supreme Court upheld that decision against the candidate's First Amendment challenge, explaining that public television stations have a "duty to

schedule programming that serves the 'public interest[.']"   *Id.* at 673 (quoting 47 U.S.C. § 309(a)).   Thus, the criteria that a public station uses to decide which candidates to invite to a debate must merely be reasonable and neutral as to the candidates' viewpoints.   *See id.* at 682. And the Court made clear that, when a station excludes a candidate based on his "objective lack of support," the station acts both reasonably and neutrally with respect to viewpoint.   *Id.* at 683.

That is all KET did here.   Its debate criteria had nothing to do with a candidate's views; rather, they measured whether voters had shown an objective interest in hearing the candidate, *e.g.*, whether only a marginal number of voters had supported him through donations and in the polls.   Per *Forbes*, KET was "not only permitted, but indeed required" to put viewers' interests above a candidate's.   *Id.* at 673.   Indeed, in *Forbes* the Court considered much the same evidence of candidate viability that KET considered here.   Like Patterson, Forbes had little financial support and had failed to generate serious interest among voters.   *See id.* at 682.   Thus the decision to exclude Patterson, like the decision to exclude Forbes, "was a reasonable, viewpoint-neutral exercise of journalistic discretion consistent with the First Amendment."   *Id.* at 683.

Patterson argues that KET used these criteria as a "facade" for viewpoint discrimination. *See Cornelius v. NAACP Legal Def. & Ed. Fund, Inc.*, 473 U.S. 788, 811 (1985).   Yet throughout this litigation Patterson has not made clear what his supposedly disfavored viewpoint was.   He now says that KET excluded him because he is pro-life.   But there are several problems with that theory, first among them that Patterson abandoned it by not arguing it below.   *See Taft Broad. Co. v. United States*, 929 F.2d 240, 243 (6th Cir. 1991).   Moreover, Patterson offers no evidence that he was publicly pro-life, that KET knew (or had reason to know) that he was pro-life, or that KET is generally hostile to pro-life views.   And KET readily invited Senator McConnell, who unlike Patterson had openly campaigned against abortion.

Patterson also suggests that KET discriminated against all third-party candidates.   But that is not a theory of viewpoint discrimination, since not all third-party candidates have the same views.   Moreover, the evidence shows that KET wrote its criteria so that third-party candidates could meet them.   A previous third-party candidate, for example, had polled at 10%— and Patterson himself says he almost did.   And Patterson cites nothing to support his assertion

that, throughout the election season, KET revised the criteria to exclude third-party candidates, rather than to refine the criteria for legitimate reasons.

That leaves Patterson's theory that KET discriminated against him as a Libertarian. This theory seems to be based on a number of internal KET emails from which Patterson asks us to infer discriminatory intent. Some emails discuss excluding from the debate an "eccentric" candidate—who both sides agree was not Patterson—and "out of state crusaders." Yet these emails do not mention Patterson or Libertarians. They relate instead to the primary debates, which featured only Democratic and Republican candidates (and at which point Patterson had not even qualified for the ballot).

A few emails do refer to Patterson. Specifically, one KET official asked for confirmation that the October debate would not include Patterson and another candidate "because they did not meet our pre-established criteria." But the only inference one can draw from this email is that KET did in fact exclude Patterson and others based on their failure to satisfy the criteria, not their views. In another email, a KET board member—who mistakenly thought that the debate would include a Libertarian candidate—said she wished it would not. But she had no say in who participated. Finally, after being named in this suit, Goodman asked a friend over email whether he should "take the 5th." Patterson says this email shows that Goodman thought KET had engaged in viewpoint discrimination. But no other evidence, including Goodman's 14 hours of testimony, suggests that KET in fact did. Hence these emails cannot prove Patterson's theory.

To be sure, some remarks in the emails—particularly those about candidates other than Patterson—were in poor taste. Yet the fact remains that, with relatively few limits, KET could invite to its debates whomever it wanted. *See Forbes*, 523 U.S. at 682-83. And Patterson fails to show that KET violated those limits here. The district court correctly found the KET officials entitled to qualified immunity.

2.

Patterson next argues that KET's criteria were themselves unconstitutional. As an initial matter, this challenge asks us to do just what *Forbes* tells us not to do: namely, to "oversee" KET's "day-to-day" editorial decisions. *Id*. at 674. In any event, Patterson's arguments lack

merit.  He first equates the donation requirement, the polling requirement, and the August 15 deadline to so-called ballot-access requirements, *i.e.*, restrictions on who may appear on the ballot.  Those restrictions are unconstitutional if they do not leave the ballot "genuinely open to all." *Lubin v. Parnish*, 415 U.S. 709, 719 (1974).  But KET restricted who could appear in a televised debate, not on the ballot.  And under *Forbes*, states have substantial discretion to restrict that type of access.

Patterson also suggests that the criteria were unreasonable under *Forbes*.  Here his theory seems to be that KET used a more onerous selection process than the one *Forbes* upheld.  But if anything, the KET criteria made the process more reasonable:  whereas Arkansas made ad hoc decisions about whom to invite, KET applied objective criteria.  That Patterson found them difficult to meet does not make them unreasonable.  Instead it simply showed his "objective lack of support." *Forbes*, 523 U.S. at 683.

Patterson's other challenges to the criteria largely restate his First Amendment claims, and thus fail for largely the same reasons.  He says the criteria violated the Due Process Clause because KET did not publish them.  But KET was not required to create—let alone publish—any criteria at all. *See Forbes*, 523 U.S. at 681.  Nor does the record support Patterson's assertion, pitched as an equal-protection claim, that KET applied looser criteria to the major candidates.  Although KET had invited Senator McConnell and Secretary Grimes before finalizing the debate criteria, no one disputes that they met those criteria—and even the more stringent criteria that KET had drafted by that point.  The district court therefore correctly granted summary judgment to KET on these claims.

B.

Patterson further challenges the dismissal of his damages claim against Goodman and the grant of summary judgment to KET on the rest of his claims.  We review those decisions de novo. *See Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 765 (6th Cir. 2014).

Patterson argues that the district court erred in dismissing his damages claim against Goodman, which, he says, was the same as the claims against other KET officials that the court allowed to proceed to discovery.  To survive a motion to dismiss, a claim must state a plausible

ground for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Patterson asserts now that Goodman was intimately involved in the decision to exclude him from the debate. But Patterson failed to make the same assertion in his complaint. That document mentions Goodman only four times: twice stating that he was "involved" in the alleged conduct; once stating that he had received an email about Patterson; and once stating that he discussed a different candidate in another email. None of these allegations made plausible the claim that Goodman was involved in the decision to exclude Patterson from the debate (which, for the reasons above, was not itself unlawful). Hence the district court correctly dismissed that claim.

## C.

Finally, Patterson challenges the denial of his motion for reconsideration—specifically of the dismissal order just discussed—or for leave to amend his complaint. We review those decisions for an abuse of discretion. *See Luna v. Bell*, 887 F.3d 290, 297 (6th Cir. 2018) (reconsideration); *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 461 (6th Cir. 2017) (leave to amend).

Patterson filed this motion well after discovery had closed. At that point, the parties had litigated the case for two years, over which they had deposed KET officials for many hours. Perhaps unsurprisingly, then, Patterson's motion identified no evidence that the district court had not already considered. Rather, the motion merely cited entire depositions (with scant citations to specific statements therein) in an attempt to reopen claims that the court had already decided in KET's favor. That motion gave the court no cause either to reconsider its decision or to allow Patterson to amend his complaint. *See Luna*, 887 F.3d at 297; *Duggins v. Steak 'N Shake*, 195 F.3d 828, 834 (6th Cir. 1999). The court was well within its discretion to decline to do so.

\*          \*          \*

The district court's judgment is affirmed.