REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 713

SEPTEMBER TERM, 2014

---

JOHN T. MITCHELL

v.

MARYLAND MOTOR VEHICLE
ADMINISTRATION

---

Eyler, Deborah, S.,
Arthur,
Kenney, James. A., III (Retired,
        Specially Assigned),

JJ.

---

Opinion by Eyler, Deborah, S., J.

---

Filed:  November 25, 2015

John T. Mitchell applied to the Maryland Motor Vehicle Administration ("MVA") for vanity plates bearing the letters MIERDA. The application was granted. Two years later, the MVA received a complaint from a member of the public about Mitchell's vanity plates. It investigated and determined that "mierda" is the Spanish word for "shit." Pursuant to a State regulation giving the MVA discretion to deny or rescind vanity plates that contain profanities, epithets, or obscenities, the MVA rescinded Mitchell's vanity plates.

Mitchell challenged the MVA's action in a contested case hearing before an Administrative Law Judge ("ALJ"). The ALJ decided that the MVA properly exercised its discretion to rescind Mitchell's vanity plates and that its action did not violate Mitchell's First Amendment right to free speech. The Circuit Court for Prince George's County upheld the decision, and this appeal followed.

The novel issues before this Court are whether messages on vanity plates are government speech or private speech on government property; and if they are the latter, what degree of government restriction may be imposed on that private speech under the Free Speech Clause of the First Amendment.[1] We hold that Mitchell's vanity plate message is private speech on government property, not government speech. Under prevailing United States Supreme Court jurisprudence, Maryland vanity plates are a "nonpublic forum," in which government restrictions on private speech will pass muster

---

[1] The First Amendment to the United States Constitution applies to the States through the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652 (1925).

under the First Amendment if they are reasonable and viewpoint neutral. As applied in this case, Maryland's restriction against profanities, epithets, and obscenities on vanity plates satisfies that test.

## FACTS AND PROCEEDINGS

All vehicles registered in Maryland must display license plates issued to the vehicle owner by the MVA. Md. Code (1977, 2012 Repl. Vol.), § 13-411 of the Transportation Article.[2] For most vehicles, license plates must be displayed on the front and back, so the plates are issued in sets. § 13-410(a). Each set of license plates displays a unique "registration number" assigned by the MVA. The registration number is made up of letters, numerals, or a combination of both. § 13-410(b).

Ordinarily, when a vehicle is registered, the MVA issues the owner a set of standard base license plates.[3] The MVA is authorized to issue various types of special license plates, instead of the standard base plates, for which the vehicle owner must pay a fee in addition to the usual registration fee.

"Personalized registration plates"—known in the vernacular as "vanity plates"—bear a registration number that the vehicle owner selects, and the MVA then assigns to the vehicle, instead of assigning a standard registration number. § 13-613(a) and (c). *See*

---

[2] Unless otherwise specified, all statutory references in this opinion are to the Transportation Article.

[3] A purchaser of a new car who is trading in his or her previous vehicle may elect to transfer the license plates from the old car to the new car. Code of Maryland Regulations (COMAR) 11.15.11.02 and 11.15.11.03.

*also* Md. Motor Vehicle Administration, *Personalized (Vanity) License Plates*, Maryland.gov, http://www.mva.maryland.gov/vehicles/licenseplates/personalized-license-plates.htm (last visited Nov. 9, 2015). A vehicle owner may apply for vanity plates that display a registration number of no more than seven selected alphanumeric characters. § 13-613(c)(1). The MVA has discretion to "refuse any combination of letters and numerals" requested. *Id*. at (c)(2). Right now, vanity plates cost $50 per year. *Id*. at (b). The fees collected for vanity plates are distributed to the Maryland Transportation Trust Fund. *Id*. at (d).

For the most part, the only difference between vanity plates and standard base license plates is the personalized registration number. Unlike vanity plates, most of the other special license plates the MVA is authorized to issue alter the design of the license plate itself. What we shall call "commemorative plates" are specially designed base license plates that are alternatives to the standard base license plate. Presently, Maryland manufactures two commemorative plates: "Chesapeake Bay Plates," depicting a blue heron and marsh grass and bearing the slogan "*Treasure the Chesapeake*," *see* § 13-618 and Code of Maryland Regulations (COMAR) 11.15.15.01(A); and "Agricultural Plates," depicting a farm scene and bearing the slogan, "*Our Farms, Our Future,*" *see* § 13-619.2; COMAR 11.15.30.01(A). At this time, commemorative plates cost $20 initially, with a $10 per year renewal fee. *See* Md. Motor Vehicle Administration, *MVA Fee Listing*, Maryland.gov, http://www.mva.maryland.gov/about-mva/fees/index.htm ("MVA Fee Listing") (last visited Nov. 9, 2015).

The largest class of special license plates the MVA is authorized to issue are those that may be obtained by vehicle owners associated with non-profit organizations. We shall refer to these as "specialty plates." Specialty plates are custom designed for an organization to depict its name, initial, emblem, or logo. § 13-619. A vehicle owner who demonstrates that there are at least 25 other vehicle owners in the same class may make a request to the MVA to manufacture a proposed specialty plate. § 13-619(c)(2). If the MVA approves the design for the proposed specialty plate, the plate will be manufactured and issued to all qualified applicants, for the required fee. The registration numbers on those specialty plates match the number of owners who have applied for and obtained the plates. Over 800 specialty plates have been issued by the MVA.[4] Presently, the fee for specialty plates is $25 with a logo and $15 without a logo, with no yearly renewal fee. *See* MVA Fee Listing, *supra*.

The case at bar involves vanity plates and, to some extent, commemorative plates. It does not involve specialty plates.

In 2009, Mitchell accessed the MVA's website and submitted an on-line application for vanity plates to be assigned the 7 letters "MIERDA," and to appear on the commemorative Agricultural Plate. He paid the vanity plate fee and the commemorative plate fee. The MVA approved his application and issued his vehicle Agricultural Plates

_____

[4] *See* Md. Motor Vehicle Administration, *Organizational Plates*, Maryland.gov, http://www.mva.maryland.gov/vehicles/specialty-plates/organizational-sp.htm (last visited Nov. 9, 2015). This area of the MVA's website shows all the specialty plates that have been approved.

bearing the registration number "MIERDA." Mitchell renewed his registration for those plates in June of 2011.

In December of 2011, the MVA received a letter from a member of the public complaining that Mitchell's vanity plates were inappropriate. This prompted Sharon Crow, Manager of the MVA's Motor Carrier and Electronic Services Division, to look up the word "mierda" on a Wikipedia website. She discovered that "mierda" is the Spanish word for "shit." The definition redirected her to a Wikipedia site entitled "Spanish profanity." That site gave as the first definition for "mierda" "a noun meaning 'shit.'"[5]

In the ordinary course of operations, Crow's Division maintains the "objectionable plate list," *i.e.*, a list of words and various combinations of characters the MVA has deemed not acceptable to appear on Maryland license plates, under regulations it has promulgated. The list is not exhaustive. When the MVA receives information that a word or combination of characters is not acceptable, it updates the list to so reflect. Often that information will come from the prisoners who actually make the license plates. At the relevant time in this case, the employee in Crow's Division whose job it was to check vanity plate applications against the objectionable plate list did not speak Spanish.

---

[5] Collins Spanish Dictionary 373 (Colin Smith et al. eds., 10th ed. 1981), defines "mierda" as follows:

> **mierda** *nf* (*tabu*) (**a**) shit (*tabu*); (*fig*) filth, dirt. … (**b**) (*fig*) **es una** – he's a shit (*tabu*); **es un don M**—he's a nobody; **coger** (*or* **pillar**) **una** – to get sozzled (*sl*); **¡vaya Vd a la –!** go to hell!

The English word "shit" is on the "objectionable plate list" and was on that list when Mitchell applied for his vanity plates. The Spanish word "mierda" was not on the list then, when Mitchell renewed the registration for his vanity plates, or when the MVA received the complaint about his vanity plates.

Based on her newly acquired knowledge of the meaning of the Spanish word "mierda," Crow decided that Mitchell's vanity plates should be rescinded. On December 27, 2011, the MVA notified Mitchell by letter that his vanity plates "ha[d] been issued in error and were being recalled." The letter cited COMAR 11.15.29.02(D), which states that the MVA has discretion to rescind a vanity plate that contains profanities, epithets, or obscenities.[6] The MVA informed Mitchell that he could apply for new vanity plates, which, if available, would be "ordered and issued gratis"; and enclosed a refund application in case he did not wish to order new vanity plates. The MVA issued Mitchell "a gratis set of regular plates" for him to use in the meantime.

By letter of January 31, 2012, Mitchell asked the MVA to "consider reversing its decision" and to allow him to keep his vanity plates. He argued "that because [his] plates are" Agricultural Plates, the word "mierda" is "particularly appropriate since our farms produce a lot of it and use a lot of it to grow our food." He claimed to have a "First Amendment right to use the combination of letters of [his] choice to express a message or

---

[6] As discussed *infra*, the same regulation, at part (C), gives the MVA discretion to rescind a vanity plate that contains "a scatological . . . meaning or connotation." The MVA did not base its decision to rescind Mitchell's vanity plates on part (C), for reasons that are not explained.

6

viewpoint." In the event the MVA was unwilling to reverse its decision, he requested a contested case hearing before the Office of Administrative Hearings ("OAH").[7]

The MVA was not persuaded by Mitchell's letter and the matter was referred to the OAH. A contested case hearing was held before an ALJ on April 23, 2012. The MVA was represented by counsel. Mitchell represented himself.[8]

Mitchell was the sole witness in his case. He testified that he was born in Chile and is fluent in Spanish. He opined that "mierda" does not "mean exclusively shit"; it also means "[c]ompost or trash, or good for nothing." He claimed that he chose the word "mierda" for his vanity plates "to support agriculture." He "was just getting down to earth of saying that we ought to go more with the earth and the compost." Mitchell agreed that "mierda" is a Spanish word that can be understood to mean "shit."

Crow was the only MVA witness. She testified about the MVA's process for issuing vanity plates, the "objectionable plate list," the complaint about Mitchell's vanity plates, her Wikipedia search of the word "mierda," and the MVA's ultimate decision to rescind Mitchell's vanity plates. A print-out of Crow's Wikipedia search was introduced into evidence, without objection.

---

[7] COMAR 11.15.29.05 states:

> An organization or individual whose preferred letters, numbers, emblems, terms, symbols, logos, or a combination of them are disapproved by the [MVA] under this chapter is entitled to a hearing before the [OAH] pursuant to the Administrative Procedures Act.

[8] Mitchell is a lawyer. He is a member of the District of Columbia bar.

On July 17, 2012, the ALJ issued her written decision. In her findings of fact, she explained that, pursuant to COMAR 11.15.29.02(D), the MVA "may refuse to issue or rescind issuance of a registration plate containing . . . profanities, epithets, or obscenities." She recognized "that the term 'mierda' has many alternative definitions, a number of which are not obscene or profane," but nevertheless found:

> [T]he MVA reasonably exercised its discretion under section 13-613 . . . to rescind issuance of [Mitchell]'s personalized license plates. [Mitchell] may feel comfortable driving around in a car labeled with what many Spanish-speaking individuals might consider obscene under at least one definition. Nevertheless, a government agency such as the MVA is justified in choosing not to officially support such action. Furthermore, the First Amendment does not require [them] to do otherwise.

In her "Conclusions of Law," the ALJ ruled that the MVA had properly recalled Mitchell's vanity plates under section 13-613 and COMAR 11.15.29.02(D).

Mitchell filed a petition for judicial review in the Circuit Court for Prince George's County. Oral arguments were scheduled for July 19, 2013. On that date, counsel appeared on behalf of the MVA. Mitchell did not appear. The circuit court issued an order affirming the MVA's final decision to recall Mitchell's vanity plates. The order was entered on the docket on August 5, 2013.

In the meantime, on July 23, 2013, Mitchell filed a motion to vacate the judgment and reopen the case.[9] The court denied the motion by order entered on May 8, 2014.

_____

[9] Mitchell represented that he had been under the misimpression that the July 19, 2013 hearing was to begin at 4:00 p.m., when in fact it was scheduled earlier than that.

8

Mitchell filed a timely notice of appeal to this Court. He poses three questions, which we have reordered and reworded:

I. Was there substantial evidence in the record to support the MVA's finding that the Spanish word "mierda" is obscene?

II. Did the MVA violate its own regulation when it rescinded his vanity plates?

III. Did the MVA violate his First Amendment right to freedom of speech by rescinding his vanity plates?

**STANDARD OF REVIEW**

In an appeal from a judgment of the circuit court in a judicial review action "[w]e review only the decision of the administrative agency itself." *Howard Cty. Dep't of Soc. Servs. v. Linda J.*, 161 Md. App. 402, 407 (2005); *accord Comptroller v. Science Application Int'l Corp.*, 405 Md. 185, 192 (2008). We "do not evaluate the factual findings and conclusions of law made by the circuit court." *Tabassi v. Carroll Cty. Dept. of Soc. Servs.*, 182 Md. App. 80, 86 (2008). "In reviewing the agency decision, which is deemed prima facie correct, [we] must view it in the light most favorable to the agency." *Motor Vehicle Admin. v. Lindsay*, 309 Md. 557, 563 (1987).

> We apply a limited standard of review and will not disturb an administrative decision on appeal if substantial evidence supports factual findings and no error of law exists. [I]f the issue before the administrative body is fairly debatable, that is, that its determination involved testimony from which a reasonable man could come to different conclusions, the courts will not substitute their judgment for that of the administrative body. We are under no constraint, however, to affirm an agency decision premised solely upon an erroneous conclusion of law.

*Tabassi*, 182 Md. App. at 86 (citations and internal quotation marks omitted).

9

**DISCUSSION**

**I.**

Focusing on the ALJ's use of the word "obscene" in her opinion, Mitchell contends there was not substantial evidence in the record to support the ALJ's finding that the MVA's recall of his vanity plates was permissible under COMAR 11.15.29.02(D). He maintains that our review is limited to whether there was substantial evidence to support the ALJ's finding that his vanity plates properly were recalled because "mierda" is an obscenity. He asserts that "mierda" does not meet the definition of an obscenity under Maryland constitutional law, and therefore the ALJ's decision cannot be upheld.[10]

The MVA counters that the ALJ did not restrict her decision to a finding that the word "mierda" is an obscenity. Rather, she concluded that the vanity plates violated

---

[10] "Obscene," as defined in Maryland Code (2002, 2012 Repl. Vol.), section 11-203(a)(5) of the Criminal Law Article ("CL"), precisely tracks the definition of that term adopted by the United States Supreme Court in *Miller v. California*, 413 U.S. 15, 24 (1973). The Maryland definition is:

> (i) that the average adult applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest;
> (ii) that the work depicts sexual conduct [as specified in CL section 11-203(b)] in a way that is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material; and
> (iii) that the work, taken as a whole, lacks serious artistic, educational, literary, political, or scientific value.

Obscene material is not protected by the First Amendment. *Miller*, 413 U.S. at 23.

10

COMAR 11.15.29.02(D) generally, and therefore her decision encompassed a finding that the word "mierda" is a profanity.[11] The MVA maintains that there was substantial evidence to support a finding that "mierda" is a profanity. It also maintains that there was substantial evidence to support a finding that "mierda" is an obscenity.

The MVA's letter to Mitchell stated that it was rescinding his vanity plates pursuant to COMAR 11.15.29.02(D), which, as mentioned, provides that license plates containing "profanities, epithets, or obscenities, [are] not . . . acceptable." In her discussion, the ALJ stated "that the term 'mierda' has many alternative definitions, a number of which are not obscene or profane," and concluded that the MVA properly recalled Mitchell's vanity plates pursuant to COMAR 11.15.29.02(D). The ALJ's additional comment that "many Spanish-speaking individuals might consider [mierda] to be obscene," does not change the fact that she ruled on the basis of COMAR 11.15.29.02(D) generally. Thus, the ALJ's decision was not limited to a finding that "mierda" is an obscenity. It included a finding that "mierda" is a profanity.

The Wikipedia definition of "mierda" as a Spanish profanity meaning "shit" and Mitchell's own testimony that the word can be understood to mean "shit" were

---

[11] Although some profanities may be obscenities, profanities more broadly include words that are irreverent, blasphemous, ribald, impious, irreligious, or wicked. *The Oxford English Dictionary* 570 (2d ed. 1989).

11

substantial evidence to support the ALJ's finding that the MVA acted in accordance with COMAR 11.15.29.02(D) in rescinding Mitchell's vanity plates.[12]

**II.**

COMAR 11.15.29.04 states:

A complaint that a plate violates the conditions of Regulation [11.15.29].02 of this chapter may cause the [MVA] to review the matter, but may not by itself serve as a basis for a determination that the conditions of Regulation [11.15.29].02 of the chapter have been violated.

Mitchell contends the MVA violated this regulation by rescinding his vanity plates based on a single complaint. The State responds that "the MVA did not rely on [the] complaint alone. Instead, it was only after the MVA conducted an investigation and did independent internet research that it concluded the plate violated its regulations and issued a recall notice."

This issue was not raised before the ALJ, or decided by her. In any event, there is no merit to it. The MVA did not issue its notice rescinding Mitchell's vanity plates immediately upon receiving the complaint about them. On the contrary, after receiving the complaint, the MVA conducted an investigation into the meaning of the word "mierda" and determined that it is a Spanish profanity that translates into the English

---

[12] In his brief, Mitchell complains about the veracity of Wikipedia as a source. (Wikipedia articles are "written collaboratively by largely anonymous volunteers." Wikipedia: About, https://en.wikipedia.org/wiki/Wikipedia:About (Nov. 23, 2015)). As noted, at the hearing, he did not object to the admission of the Wikipedia entry into evidence.

12

word "shit." On that basis, not on the basis of the single complaint, the MVA rescinded Mitchell's vanity plates. The MVA did not violate its own regulation by doing so.

**III.**

Mitchell's main contention in this appeal is that the State of Maryland, through the MVA, violated his First Amendment right to freedom of speech by rescinding his vanity plates so he no longer can express his MIERDA message on them. He argues that a vanity plate message is private speech on government property and therefore is protected by the First Amendment; that vanity plates are a public forum created by statute for private speech; and that government restriction on private speech in a public forum only may be upheld if it is necessary to serve a compelling State interest, is narrowly drawn to achieve that interest, and is viewpoint neutral. He maintains that COMAR 11.15.29.02(D), as applied to his case, does not satisfy that strict scrutiny standard.[13]

The MVA counters that a message communicated on a vanity plate is speech by the government, not by the vehicle owner; and because the Free Speech Clause of the First Amendment does not apply to government speech, the State did not violate, and could not have violated, Mitchell's First Amendment rights by rescinding his MIERDA vanity plates. Alternatively, if a message on a vanity plate is private speech on government property, the vanity plate is a "nonpublic forum" in which the government may restrict speech so long as it acts reasonably and in a viewpoint neutral manner in

---

[13] Mitchell does not make a facial challenge to the validity of section 13-613 or COMAR 11.15.29.02(D).

doing so. The MVA takes the position that the State's prohibition against vanity plates that display profanities, epithets, or obscenities meets that standard and it acted properly by rescinding Mitchell's vanity plates bearing the Spanish word for "shit."

**(a)**

"The Free Speech Clause [of the First Amendment] restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). Accordingly,

> government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas. Instead, the Free Speech Clause helps produce informed opinions among members of the public, who are then able to influence the choices of a government that, through words and deeds, will reflect its electoral mandate.

*Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, ___ U.S. ___, ___, 135 S. Ct. 2239, 2245–46 (2015) (citations omitted). In *Walker*, which we shall discuss in depth below, the Supreme Court held that specialty plates are government speech, and, consequently, government regulation of what is depicted on them does not implicate the First Amendment free speech rights of the vehicle owners who obtain them.

By contrast, the First Amendment *does* apply to private speech on government property. It is well-established, however, that "the government need not permit all forms of speech on property it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678 (1992). Whether and to what extent the government may restrict private speech on its property depends upon "the physical characteristics of the forum in question, the nature of its use (including its location and purpose), and the

government's intent in constructing the space." *Perez v. Hoblock*, 368 F.3d 166, 172 (2d Cir. 2004). The analytical framework for deciding whether government regulation of private speech on government property violates the Free Speech Clause of the First Amendment is known as the "forum doctrine." *Hotel Emp. & Rest. Emp. Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. New York Dep't of Parks and Recreation*, 311 F.3d 534, 544 (2d Cir. 2002).

Under the forum doctrine, there are three types of public fora. A "traditional public forum is property, such as a public street or a park, that 'by long tradition or by government fiat . . . ha[s] been devoted to assembly and debate.'" *Perry v. McDonald*, 280 F.3d 159, 166 (2d Cir. 2001) (quoting *Perry Educ. Ass'n v. Perry Local Educ. Ass'n,* 460 U.S. 37, 45 (1983)). These properties "traditionally have been available for public expression" and "the free exchange of ideas," *Hotel Emp.*, 311 F.3d at 544, and they "exist 'regardless of the government's intent' to create or not to create a forum for speech." *Sons of Confederate Veterans, Inc. v. Comm'r of the Va. Dept. of Motor Vehicles*, 288 F.3d 610, n.10 (4th Cir. 2002) (citing *Ark. Educ. Television Comn'n v. Forbes,* 523 U.S. 666, 678 (1998)). "Government restrictions on speech in a traditional public forum are subject to strict scrutiny" review, *i.e.*, they must be "'necessary to serve a compelling state interest [and] narrowly drawn to achieve that interest.'" *Perry v. McDonald*, 280 F.3d at 166 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)).

A "designated public forum" "exists where 'government property that has not traditionally been regarded as a public forum is intentionally opened up for that

15

purpose.'" *Walker*, 135 S. Ct. at 2250 (quoting *Summum*, 555 U.S. at 469). In such a public forum, there is a full range of expressive activity, just as there is in a traditional public forum. *Hotel Emp.*, 311 F.3d at 545. Finally, a "limited public forum" exists when "a government has 'reserv[ed a forum] for certain groups or for the discussion of certain topics.'" *Walker*, 135 S. Ct. at 2250 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995)).

Because in the case of a designated public forum and a limited public forum, the government intentionally has created a forum for free expression by members of the public, regulation of speech in those fora, like regulation of speech in a traditional public forum, must satisfy the strict scrutiny standard. *Perry v. McDonald*, 280 F.3d at 166.

The forum doctrine also recognizes what is known as a "nonpublic forum." "A 'nonpublic forum' is a 'property that the government has not opened for expressive activity by members of the public.'" *Perez*, 368 F.3d at 172–73 (quoting *Hotel Emp.*, 311 F.3d at 356). "In a nonpublic forum, the government 'reserve[s] eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission' . . . to use it.'" *Sons of Confederate Veterans, Inc.*, 288 F.3d at n.10 (quoting *Ark. Educ. Television Comm'n*, 523 U.S. at 679). A nonpublic forum "exists '[w]here the government is acting as a proprietor, managing its internal operations.'" *Walker,* 135 S. Ct. at 2251 (quoting *Int'l Soc'y for Krishna*, 505 U.S. at 678). Government regulation of speech in a non-public forum is not subject to strict scrutiny review. "The government may impose restrictions on speech in a nonpublic forum as

16

long as these restrictions are reasonable and viewpoint-neutral." *Perry v. McDonald*, 280 F.3d at 166.

**(b)**

In deciding whether vanity plate messages are government speech, we first look for guidance to the Supreme Court's decision in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239 (2015). As noted, *Walker* involved specialty plates, not vanity plates. Nonetheless, it is a very recent decision and is the first time in almost 40 years the Supreme Court has addressed a First Amendment Free Speech Clause challenge in the context of license plates.[14]

In *Walker*, the Texas Division of the Sons of Confederate Veterans ("SCV") submitted a proposal to the Texas Department of Motor Vehicles Board ("Board") for a specialty plate design featuring a graphic of the Confederate flag. The Board rejected the proposal on the ground that many people would find the design offensive. The SCV challenged that decision in federal district court, which entered judgment in favor of the Board. The Court of Appeals for the Fifth Circuit reversed, holding that "Texas's specialty license plate designs are private speech and that the Board, in refusing to

---

[14] The last such case was *Wooley v. Maynard*, 430 U.S. 705 (1977), which concerned compelled speech. The State of New Hampshire's standard license plates bore the motto "Live Free or Die," and it was a crime to cover the motto on a license plate. The petitioners found the motto morally offensive and contrary to their religious beliefs. They covered the motto on their license plates, and were charged criminally for doing so. The Supreme Court held that the law could not be enforced, because the State may not constitutionally require an individual to participate in disseminating an ideological message by displaying it on his private property (*i.e.*, his vehicle) in a manner and for the express purpose that it be observed and read by the public. *Id.* at 713.

17

approve SCV's design, engaged in constitutionally forbidden viewpoint discrimination." *Walker*, 135 S. Ct. at 2245.

The Supreme Court granted Texas's petition for writ of *certiorari* and, in a 5 to 4 decision, reversed. The Court held that "specialty license plates issued pursuant to Texas's statutory scheme convey government speech[,]" and, because "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says[,]" there could be no First Amendment violation. *Id*. at 2245–46.[15] The Court articulated three primary grounds for its holding.

First, since 1928, when Idaho introduced a standard base license plate "proclaim[ing] 'Idaho Potatoes' and featur[ing] an illustration of a brown potato," "States have used license plate slogans to urge action, to promote tourism, and to tout local industries." *Id*. at 2248. Thus, by history and tradition, license plates have been used by State governments for government expression.

Second, license plates are governmental in nature, as "is clear from their faces," *id*., and, by serving the dual governmental purposes of vehicle registration and identification, they "are, essentially, government IDs." *Id.* at 2249. Because "issuers of ID[s] 'typically do not permit' the placement on their IDs of 'message[s] with which they do not wish to be associated[,]'" *id.* (quoting *Summum*, 555 U.S. at 471), "'persons who observe' designs on IDs 'routinely—and reasonably—interpret them as conveying some

---

[15] The Supreme Court used the term "specialty plate" in the exact same way we are using it here.

18

message on the [ID issuer's] behalf.'" *Walker*, 135 S. Ct. at 2249 (quoting *Summum*, 555 U.S. at 471). Consequently, license plate designs "'are often closely identified in the public mind with the [State].'" *Walker*, 135 S. Ct. at 2248 (alternation in original) (quoting *Summum*, 555 U.S. at 472). A vehicle owner who seeks a specialty plate likely "intends to convey to the public that the State has endorsed that message"; and will obtain a specialty plate, instead of simply affixing a bumper sticker to his vehicle, because "Texas's license plate designs convey government agreement with the message displayed." *Walker*, 135 S. Ct. at 2249.

Finally, States exercise "direct control" "over the messages conveyed on [their] specialty plates." *Id*. In Texas, "[t]he Board must approve every specialty plate design proposal before the design can appear on a Texas plate." *Id*. "Texas has effectively controlled the messages [conveyed on specialty plates] by exercising final approval authority over their selection." *Id*. (citations and internal quotation marks omitted).

In summary,

> Texas, through its Board, selects each design featured on the State's specialty license plates. Texas presents these designs . . . on government-issued IDs that have traditionally been used as a medium for government speech. And it places the designs directly below the large letters identifying "TEXAS" as the issuer of the IDs. "The [designs] that are accepted, therefore, are meant to convey and have the effect of conveying a government message, and they thus constitute government speech." [*Summum*, 555 U.S.] at 472.

*Id.* at 2250 (first alteration in the original).

The *Walker* Court went on to observe that specialty plates do not fit within any of the fora recognized for private speech on government property, under the forum doctrine,

19

a point that in its view lent additional support to their being government speech. Obviously, license plates are not a traditional public forum. The final authority the State of Texas wields over each specialty plate design "militates against a determination that Texas has created a public forum." 135 S. Ct. at 2251. Texas's "ownership" of each specialty plate design makes it "particularly untenable that the State intended specialty plates to serve as a forum for public discourse." *Id.* And the facts that license plates "traditionally have been used for government speech, are primarily used as a form of government ID, and bear the State's name[,]" "indicate that Texas explicitly associates itself with the speech on its plates." *Id.* Finally, specialty plates are not a nonpublic forum for private speech because "Texas is not simply managing government property, but instead is engaging in expressive conduct." *Id.*

The *Walker* Court made clear that its analysis and holding "concerned only . . . specialty license plates," and that it was not addressing whether messages on vanity plates are government speech. *Id*. at 2244. That is the question we face here.

Only a handful of courts across the country have adjudicated First Amendment challenges to government restrictions on vanity plate messages, either facially or as-applied. Of the cases decided before *Walker*, most make no mention of government speech. Instead, the courts analyze the First Amendment challenges under the forum doctrine, deciding implicitly that the messages are *not* government speech. *See Perry v. McDonald,* 280 F.3d 159 (vanity plates are a nonpublic forum; State of Vermont did not act unreasonably or discriminate based on viewpoint by revoking vehicle owner's "SHTHPNS" vanity plate); *Lewis v. Wilson*, 253 F.3d 1077 (8th Cir. 2001) (statute

20

allowing State agency to deny vanity plate application on ground that requested message is "contrary to public policy" gives agency unfettered discretion over content of message, in violation of First Amendment, regardless of which forum applies); *Montenegro v. N.H. Div. of Motor Vehicles,* 166 N.H. 215 (2014) (regulation permitting State agency to deny vanity plate application when the message sought is one that "a reasonable person would find offensive to good taste" is unconstitutionally vague on its face, in violation of First Amendment, regardless of whether vanity plates are a public or nonpublic forum); *Higgins v. Driver and Motor Vehicle Serv. Branch (DMV)*, 335 Or. 481 (2003) (under federal First Amendment case law, vanity plates are a nonpublic forum; Oregon vehicle administration rule prohibiting vanity plates that refer to alcoholic beverages or controlled dangerous substances is reasonable in light of the purposes of the forum and is viewpoint neutral);[16] *Kahn v. Dep't of Motor Vehicles*, 16 Cal. App. 4th 159 (Ct. of App., 2d Dist., Div. 1, Cal. 1993) (by allowing vanity plate messages, the State has not altered

---

[16] The Oregon Supreme Court, in *Higgins v. Driver and Motor Vehicle Service Branch (DMV)*, 335 Or. 481 (2003), agreed with the First Amendment forum analysis of the Oregon Court of Appeals, in *Higgins v. Driver and Motor Vehicle Services Branch (DMV)*, 170 Or. App. 542 (2000) (*en banc*). In the case at bar, the MVA relies upon the Oregon Court of Appeals's *Higgins* opinion, arguing that it holds that messages on vanity plates are government speech. That court held that such messages are "state communication," but did so solely as a matter of Oregon state constitutional law. *Id.* at 547.

the nature of license plates as identifying mechanisms nor has it opened a forum for the free expression of ideas).[17]

*Matwyuk v. Johnson*, 22 F. Supp. 3d 812 (W.D. Mich., N. Div. 2014), is the exception. There, the federal district court expressly addressed whether vanity plate messages are government speech. The case consolidated two facial challenges to a Michigan statute prohibiting vanity plates "that might carry a connotation offensive to good taste." Mich. Comp. Laws § 257.803(b) (2011). One vehicle owner's request for the vanity plates "INF1DEL" was turned down on that basis. He argued that other vanity plates voicing religious sentiments had been approved, and that his proposed message was similar in that it communicated that he did not follow any religion. The other vehicle owner's request for the vanity plates "WAR SUX" was turned down, on the same basis. He argued that he was an anti-war activist, and he wished to use his vanity plates to express his view about war.

The court concluded that messages on vanity plates "cannot reasonably be considered government speech." *Matwyuk,* 22 F. Supp. 3d at 823.

> In contrast to [specialty plates], the individuals who apply for Michigan personalized [vanity] license plates – not the government – determine the message. . . . The fact that license plates remain the property of the state .

---

[17] In *Byrne v. Rutledge*, 623 F.3d 46 (2d Cir. 2010), the question whether vanity plate messages are government speech was raised for the first time on appeal. Because it had not been raised in the district court, the Second Circuit declined to address it. Relying on its prior decision in *Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001), the court classified vanity plates as a nonpublic forum. It held that the State of Vermont acted unreasonably and committed viewpoint discrimination by banning all vanity plate letter and number combinations referring to a religion or deity.

. . . is not controlling because the Sixth Circuit has held that private speech is not transformed into government speech simply because it occurs on government property. *Miller v. City of Cincinnati*, 622 F.3d 524, 537 (6th Cir. 2010). Michigan's only role in the process [of issuing vanity plates], other than collecting the license fee and issuing the physical plate, is to determine whether the proposed combination [of letters and numerals] "might carry a connotation offensive to good taste and decency." Moreover, each [vanity] plate . . . is unique to the applicant, because duplicates are prohibited.

*Id*. at 823–24 (some citations omitted). The court agreed with the challengers that the regulation in question was facially unconstitutional, because it was overly broad, permitting the State to deny a vanity plate application "based on viewpoint" and conferring unbridled discretion upon the State as decision-maker. *Id*. at 824.

Since *Walker* was decided, one state supreme court has adjudicated a First Amendment challenge to government restrictions of vanity plate messages. In *Commissioner of the Indiana Bureau of Motor Vehicles v. Vawter*, ___ N.E. 3d ___, No. 49S00-1407-PL-494, 2015 WL 6777765, *1 (Ind. Nov. 6, 2015), the Supreme Court of Indiana held that vanity plate messages are government speech, not private speech, and therefore the First Amendment free speech rights of the vehicle owners who seek vanity plates are not implicated. We shall discuss *Vawter* and the other relevant vanity plate cases *infra*.

**(c)**

In 1910, the General Assembly enacted legislation requiring all vehicles registered in Maryland to display license plates. *See* Laws of Maryland, 1910, Ch. 207, as codified in Md. Code (1911), Art. 56, § 142 (effective date Apr. 15, 1910). Until the early 1960s, the Maryland standard base license plate was the only license plate issued to vehicle

23

owners.  It was barebones, displaying a registration number, the year, and the word "Maryland."  *See* James K. Fox, *License Plates of the United States: A Pictorial History 1903-To The Present* (Interstate Directory Pub. Company, Inc., 1997) ("Fox").[18] Beginning in the early 1960s, the General Assembly authorized the MVA to issue simple specialty plates for members of the Veterans of Foreign Wars, Laws of Maryland, 1963, Ch. 823, as codified in Md. Code (1957), Art. 66½, § 32(f), 1964 Cum. Supp. (effective date June 1, 1963); Disabled American Veterans, Laws of Maryland, 1967, Ch. 402, as codified in Md. Code (1957), Art. 66½, § 32(g), 1968 Cum. Supp. (effective date June 1, 1967); and the American Legion, Laws of Maryland, 1967, Ch. 455, as codified in Md. Code (1957), Art. 66½, § 32(h), 1968 Cum. Supp. (effective date June 1, 1967).  The registration numbers for those plates bore the organizations' initials followed by a number specific to the vehicle owner.  In the early 1990s, the MVA began issuing specialty plates, *i.e.,* those bearing graphic designs and logos for the organizations for which the plates were prepared.

The first State to authorize vanity plates was Pennsylvania, in 1931. *See* Ronald Ahrens, *The Lost History of License Plates*, Automobilemag.com (July 4, 2014)

---

[18] As is plain from the title and publication date, the Fox book only covers license plates through 1997.  There are avid license plate collectors throughout the country, many of whom display license plates on websites on the internet.  The most complete and detailed website with respect to Maryland license plates is R. Kretschmer, *Maryland License Plates Index*, Ricksplates.com (Mar. 29, 2015) http://www.ricksplates.com/maryland/ ("Rick's Plates").  This website displays photographs of all Maryland license plates from 1910 to the present.

http://www.automobilemag.com/features/magazine/1407-the-lost-history-of-license-

plates/. By the 1960s vanity plates had gained in popularity and were a well-known

cultural phenomenon. *See* License Plates History, Licenseplates.tv (2015)

http://www.licenseplates.tv/history.html.[19] More important from the standpoint of State

governments, they were a lucrative revenue-producing mechanism.

In 1971, the General Assembly enacted vanity plate legislation. *See* Laws of

Maryland, 1971, Ch. 638, as codified in Md. Code (1957, 1970 Rep. Vol.), Art. 66½, § 3-

606 (1971 Cum. Supp.) (effective date July 1, 1971). Entitled "Special registration plates

generally," section 3-606 authorized the MVA's predecessor agency, upon application of

a passenger vehicle owner and payment by the owner of a designated fee, to issue license

plates "upon which shall be inscribed a combination of not more than six (6) letters and

numbers . . . selected by the vehicle owner." *Id.* at (a). It further provided that the

predecessor agency "shall reserve the right to refuse any combination of letters and

numbers at his discretion and may adopt reasonable rules and regulations for the issuance

of such plates and for carrying out the provisions of this section." *Id.*[20]

---

[19] One of popular culture's most notable vanity plate depictions appeared in the 1964
James Bond film *Goldfinger*, in which the antagonist drove a vehicle bearing the vanity
plate "AU 1," representing the chemical symbol for gold. Internet Movie Database,
Goldfinger *Trivia*, IMDB (2015) http://www.imdb.com/title/tt0058150/trivia.

[20] The 1971 legislation was not the first of its kind in Maryland. In 1953, Laws of
Maryland, Ch. 533 the General Assembly enacted a new subsection (e) to Md. Code
(1951), Art. 66½, § 30, entitled "Special Registration plates with requested combinations
of letters and numerals." The law provided that the MVA's predecessor agency "may,
upon payment of [a specialized fee] . . . issue to any applicant registration plates upon

Continued…

In 1977, Article 66½ of the Maryland Code was repealed and recodified. Section 3-606 became section 13-613 of the new Transportation Article. Its title was changed to, "Personalized registration plates for Class A (passenger) vehicles." It provided, as it does today, that a vehicle owner "may apply . . . for the assignment to that vehicle of a special, personalized registration number." § 13-613(a).[21] According to the Revisor's note, the word "personalized" was added to the title and body of section 13-613 "to distinguish more clearly between the special plates issued under this section and those issued under other provisions of this part." In other words, the statute was reworded to clarify the distinction between vanity plates and specialty plates.[22]

COMAR 11.15.07.01 details the "Application Requirements" for a vanity plate. Among them are that the vanity plate message requested consist of no more than seven characters, including letters, numbers, and spaces; letters shall be of the English language; numerals shall be cardinal numbers; and a "symbol, diagram, dash, slash, or

_____

…continued

which shall be displayed any combination of letters and/or numerals requested by the applicant and approved by the [agency]." In 1957, the General Assembly repealed section 30(e). Laws of Maryland, Ch. 472. In Senate Bill 390, the reason given for repealing the 1953 law was that "the experience in other states has shown that special registration plates has brought chaos and confusion in the administration of motor vehicle registration" and the financial and administrative burden to the State occasioned by allowing the special plates outweighed the benefit to the State.

[21] In 1977, only owners of passenger vehicles could apply for vanity plates. That was expanded over the years, and the statute now permits owners of many other types of vehicles to apply for vanity plates.

[22] Section 13-613(c)(1) increased the number of characters that may be used on a vanity plate to 7; that language remains the same today as well.

other character" may not be requested. *Id.* at (B)(3). The MVA has discretion to refuse to issue, or to rescind, a vanity plate that duplicates an existing registration numbering system; contains a combination of letters that designates or abbreviates an official organization (for example, the DOT or ICC); is identical to an already existing Maryland vanity plate; or seeks to secure use of the characters "for fraudulent purposes." *Id*. at (C).

By additional regulation, the MVA has specified the grounds on which it "may refuse to issue or rescind the issuance of" any license plate, including a vanity plate:

> The [MVA] may refuse to issue or rescind the issuance of a registration plate containing letters, numbers, emblems, terms, symbols, logos, or a combination of them which:
>
> A. Is identical to one already issued by the [MVA];
>
> B. Is being requested for a fraudulent or deceptive purpose;
>
> C. Has a scatological or sexual meaning or connotation;
>
> D. Contains profanities, epithets, or obscenities;
>
> E. Communicates a message of any kind about any of the following characteristics of a group of people:
>
> > (1) Race,
> >
> > (2) Ethnic or national origin,
> >
> > (3) Color,
> >
> > (4) Religion,
> >
> > (5) Disability, or
> >
> > (6) Sexual orientation;
>
> F. Makes reference to the commission of illegal acts; or
>
> G. Contains any other combination that the Administrator [of the MVA] finds unacceptable within the law.

COMAR 11.15.29.02.

Maryland's standard base license plates never have displayed a State slogan.[23] Until 2010, these license plates were quite simple, displaying only the word "Maryland" and, until 1971, when removable stickers—or "validation tabs"—came to be used to show the expiration date, that date. *See* Laws of Maryland, 1970, Ch. 534 as codified in Md. Code (1957, 1970 Repl. Vol.), Art. 66½, § 3-410(c) (effective date Jan. 1, 1971). *See also* R. Kretschmer, *A Pictorial History of Maryland License Plates; Passenger Car Plates Dated 1954 to Present*, Ricksplates.com (Oct. 17, 2015) http://www.ricksplates.com/maryland/mdpass2.htm ("Rick's Plates"). The standard base license plate adopted for use in 1986 displayed a small graphic depiction of the State shield in the middle. *Id.* Vanity plates issued on that standard base plate did not include the State shield, however. *Id.* In early 2005, a legend for the State of Maryland's website (www.maryland.gov) was added to the bottom of that standard base plate. For a few months, vanity plates issued on that plate also bore that legend. The MVA then eliminated the website legend for vanity plates. *Id.*

---

[23] The Maryland standard base license plate for 1934 bore the word "Tercentenary," honoring Maryland's 300th anniversary. Then, from 1942 to 1947, the standard base plate bore the words "Drive Carefully," which is not a State slogan in that it does not concern Maryland in particular. *See* Rick's Plates, *A Pictorial History of Maryland License Plates; Passenger Car Plates Dated 1910 to 1953* (Mar. 24, 2015) http://www.ricksplates.com/maryland/mdpass1.htm. Examples of State slogans on standard base license plates are: Arizona, 1940–Present ("Grand Canyon State"); Idaho, 1957–Present ("Famous Potatoes"); Delaware, 1963–Present ("The First State"); and Wisconsin, 1940–Present ("America's Dairyland"). *See* Rick's Plates, *Gallery of Current U.S. License Plates* (Sept. 14, 2015) http://www.ricksplates.com/uscurrent.htm*; see also* James K. Fox, *License Plates of the United States: A Pictorial History 1903-To The Present* (Interstate Directory Pub. Company, Inc., 1997).

Maryland's current standard base license plate, adopted effective June 14 (Flag Day), 2010, has a "War of 1812" theme.[24] The plate depicts the American flag flying over Fort McHenry on one side, and bombs bursting in air on the other side. The word "Maryland" appears in blue at the top of the plate with the words "War of 1812" beneath it, in red. The legend for a Maryland website devoted to the War of 1812, www.starspangled200.org, appears on the bottom of the plate. Vanity plates obtained after June 14, 2010, are issued on the "War of 1812" standard issue license plate, unless they are requested to appear on a commemorative plate.[25]

Maryland standard base license plates and commemorative plates are manufactured so the characters that form the registration number follow a predetermined

---

[24] Because license plates can be transferred upon the purchase of a new car, *see* note 3, *supra*, there are many Maryland vehicles that still display the 1986-2009 standard base plates, including vanity plates.

[25] From the time Maryland began issuing commemorative plates, in 1976, vanity plates have been issued on them if requested and if both fees are paid. Maryland's first commemorative plate, honoring the country's Bicentennial, was issued from December 1975 to February 1977. *See* Rick's Plates, *A Pictorial History of Maryland License Plates; Passenger Car Plates Dated 1954 to Present* (Oct. 17, 2015) http://www.ricksplates.com/maryland/mdpass2.htm. Like all commemorative plates, it could be obtained, for a fee, as an alternative to the standard base license plate. The Bicentennial commemorative plate bore the word "BICENTENNIAL" at the top, the dates 1776 and 1976 in the bottom corners, and displayed a graphic of cannons and bombs bursting in air. From 1984 to 1987, the MVA issued a commemorative plate honoring Maryland's 350th anniversary. It bore the dates 1634 and 1984 in the top corners and the words "350th Anniversary" at the bottom. The commemorative Chesapeake Bay Plate became available in 1990. Unlike its predecessors, it can be renewed from year to year. The commemorative Agricultural Plate became available in 2001, and it too can be renewed yearly.

series.  The registration number a vehicle owner happens to be assigned by the MVA is the next one in the series.  It serves as the unique alphanumeric identifier for the vehicle, but has no intrinsic meaning.

**(d)**

The MVA argues that "there are no legitimate grounds on which to distinguish the [specialty] plates at issue in [*Walker*] and the vanity plate[s] at issue in this case."  Invoking the three grounds central to the Supreme Court's government speech analysis in *Walker*—that States historically have used license plates to communicate government messages, that license plates are government IDs for vehicles and therefore are closely identified with the State in the public mind, and that the State exercises direct control over the messages on license plates—it asserts that "Maryland's vanity plates are . . . government speech, and the State is free to recall plates . . . that include messages with which the State does not wish to be associated."  We disagree.

To be sure, in deciding whether specialty plates are government speech, the *Walker* Court considered it significant that, generally speaking, States long have used their standard base license plates for self-promotion.  While certainly not dispositive, it is worth noting that for 100 years, until the General Assembly decided to celebrate Baltimore's pivotal role in winning the War of 1812, Maryland's standard license plates did not urge, promote, or tout anything about itself.  Picture-less, symbol-less, and slogan-less, they were basic two-colored plates that can best be described as boring.  Multi-colored depictions of the State's natural resources were reserved for commemorative plates.

30

As "government IDs," vanity plates differ significantly from specialty plates. The registration number on a vanity plate is an identifier, as all license plate registration numbers are, but it is more than that. The combination of characters the vehicle owner selects creates a personalized message with intrinsic meaning (sometimes clear, sometimes abstruse) that is independent of mere identification and specific to the owner. Because it is the registration number that is being personalized, and registration numbers must be unique, the message on a vanity plate necessarily will be one-of-a-kind. Indeed, vanity plate messages are more "one-of-a-kind" than bumper stickers. At any given time, there may be multiple Maryland vehicles displaying a particular bumper sticker, but there only will be one Maryland vehicle displaying a particular vanity plate message. Specialty plates do not bear unique personalized messages. They are base plates specially redesigned for particular organizations, reflecting their emblems, slogans, and names, and may be obtained, for a fee, by any member of an organization for which the specialty plate has been approved. Many Maryland vehicles display identical specialty plates; only the registration numbers, which on a specialty plate have no intrinsic meaning and carry no message, will vary.

The State of Maryland does not create unique message-conveying vanity plates and *then* offer them for sale to vehicle owners. The opposite happens. The State only will manufacture a vanity plate upon the request of a vehicle owner who himself selects the unique alphanumeric combination that becomes the message. The message on a vanity plate serves the owner's purpose of drawing attention to himself. That is the genesis of the nickname "vanity plates." So, historically, vehicle owners have used

31

vanity plates to communicate their own personal messages and the State has not used vanity plates to communicate any message at all. Unlike the license plate slogans that States use "to urge action, to promote tourism, and to tout local industries[,]" *Walker*, 135 S. Ct. at 2248, vanity plates are personal to the vehicle owner, and are perceived as such. From the vehicle owner's perspective, his vanity plates tell the world something about himself. From other drivers' perspectives, vanity plates tell them something about the vehicle's owner, or at least challenge them to figure out what the owner is trying to communicate. From the State's perspective, vanity plates are a good source of revenue.

Of course, vanity plates, like all license plates, are government-issued articles that serve to identify the vehicles on which they are placed. As the Supreme Court observed in *Walker*, license plates are government property and their governmental nature is obvious. That does not mean that any message on a license plate is government speech. If that were the case, all speech on what clearly is government property would be government speech. That proposition has been widely rejected and is inconsistent with the Supreme Court's developed law on forum analysis. *See Matwyuk,* 22 F. Supp. 3d at 823–824 ("[P]rivate speech is not transformed into government speech simply because it occurs on government property[.]"); *see also Walker*, 135 S. Ct. 2242 ("Forum analysis . . . applies to government restrictions on purely private speech occurring on government property[.]"); *Perry v. McDonald*, 280 F.3d at 166 ("It is well established that 'the government need not permit all forms of speech on property that it owns and controls[.]'") (quoting *Int'l Soc'y for Krishna*, 505 U.S. at 678).

The personal nature of a vanity plate message makes it unlikely that members of the public, upon seeing the vanity plate, will think the message comes from the State.[26] Unlike the messages on specialty plates, which, as explained, are not one-of-a-kind and usually are displayed on a retooled plate design that bears graphics of emblems and slogans for an organization, the messages on vanity plates are not official-looking. There is nothing governmental about the message "BOB" or "FROSTY" or "68VETT" or "LVMYDOG" or "B HAP E." And the natural reaction of those who see the "BOB" vanity plate will be to think that the driver of the vehicle is speaking and is saying, "Hey world, I'm Bob." Members of the public might assume, not unreasonably, that the "BOB" vanity plates would not be on the vehicle if the MVA had not allowed them to be issued. Given the plainly personal nature of vanity plate messages, however, people making that assumption would not next assume that "BOB" is a message spoken by the State. Indeed, they would **not** assume that the State has endorsed the message so as to make the message its own. At most, they would assume that the State had permitted the vehicle owner to display the **owner's** requested message on the vanity plate.

---

[26] In his concurring opinion in *Pleasant Grove City v. Summum*, Justice Souter observed:

> [T]he best approach that occurs to me [to determine whether speech is government or private speech] is to ask whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige[.]

555 U.S. at 487.

Finally, the process for obtaining vanity plates, which gives the MVA discretion to "refuse any combination of letters and numerals," *see* § 13-613(c)(2), as implemented and made specific by COMAR 11.15.29.02 and 11.15.07.01, is not one by which the MVA exerts such tight control that the personalized messages become government speech. Specialty plates are custom designed, official-looking alternate base plates for various subsets of vehicle owners; as such, there is a stringent process by which the MVA approves them. Ultimately, it is the government, not the organization seeking the specialty plate, that determines the message that will be displayed, and how it will be displayed, on a specialty plate. *See Matwyuk,* 22 F. Supp. 3d at 828.

By contrast, vanity plates are customized personal messages to be displayed on an already available license plate. The vehicle owners, not the State, create the proposed messages and apply for them, and the MVA screens the applications. Proposed messages that violate the MVA's regulations, such as those that contain profanities, epithets, or obscenities, are supposed to be denied, although, as this case illustrates, the screening process does not always work. Ordinarily, a proposed vanity plate will be issued unless it fails the screening process. Beyond the initial screening, there is no process by which the MVA evaluates a proposed message for approval. Perhaps in recognition that the MVA has no rigorous process for evaluating proposed vanity plates, the MVA has authority to recall vanity plates issued in error. (There is no similar provision for specialty plates.) Maryland's vanity plate application process does not militate in favor of a finding that the messages on vanity plates are government speech.

34

As mentioned, in *Commissioner of the Indiana Bureau of Motor Vehicles v. Vawter*, the Indiana Supreme Court very recently held that vanity plates issued in that State are government speech. There, a certified class challenged, facially, the constitutionality of Indiana's vanity plate program, arguing, *inter alia*, that the decision making process used to deny or revoke vanity plates violated the First Amendment.[27] Although the issue before the court concerned vanity plates, not specialty plates, the court's analysis of whether vanity plates are government speech precisely tracked the Supreme Court's analysis in *Walker*.

The *Vawter* court observed that Indiana, like many other states, has used standard base license plates to communicate by slogans, *e.g.,* "WANDER" and "HOOSIER HOSPITALITY," and by graphics, such as an Indy 500 car, a checkered flag, and a scene of a sunset over a farm. 2015 WL 6777765, at *3. It found that vanity plates, like all license plates, are government IDs and therefore are "'routinely—and reasonably—interpret[ed] . . . as conveying some message on the [issuer's] behalf.'" *Id.* (quoting *Walker*, 135 S. Ct. at 2249, in turn quoting *Summum*, 555 U.S. at 471) (second alteration in original). The court also concluded that Indiana "'maintains direct control'" over vanity plate messages. *Vawter*, 2015 WL 6777765, at *4 (quoting *Walker*, 135 S. Ct. at 2249, 2284).

_____

[27] The class representative was an automobile owner who happened to be a police officer, and whose application for a vanity plate with the message "OINK" was granted but then revoked.

The court rejected the arguments that vanity plates differ from specialty plates such that, unlike specialty plates, vanity plates are not government speech. For the reasons we already have explained, and as we shall elaborate, we find the *Vawter* court's government speech analysis unpersuasive.

The court dismissed the argument that vanity plate messages are not government speech because they are "unique" and "individually crafted." *Vawter*, 2015 WL 6777765, at *3. It noted that, given Indiana's history of using license plates to communicate messages, "this difference [between specialty plates and vanity plates] is secondary and does not change the principal function of state-issued license plates as a mode of unique identification." *Id.* The court failed to appreciate that, notwithstanding that a message appears on a license plate, which always is a government ID, the unique and personal nature of the message makes plain that the speaker is the driver/owner of the vehicle, not the government.[28]

---

[28] In *Commissioner of the Indiana Bureau of Motor Vehicles v. Vawter*, ___ N.E. 3d ___, No. 49S00-1407-PL-494, 2015 WL 6777765, *1 (Ind. Nov. 6, 2015), the court relied upon the Supreme Court's decision in *Summum*, 555 U.S. 460, in rejecting the argument that the unique and personal nature of vanity plates is inconsistent with their being government speech. In *Summum*, a city in Utah owned a small public park, in which there were several monuments, including one displaying the Ten Commandments. The city's policy was that it would build a monument, or accept a monument paid for privately, if the monument reflected the history of the city or its donor was a person or entity with long-standing ties to the community. The city rejected a request by a religious group without historical or community ties to donate a monument. The Supreme Court held that permanent monuments displayed on public property typically are speech by the government that owns the property, not private speech, as governments long have used monuments on public property to speak to the public. The holding in *Summum* had nothing to do with the uniqueness of the monuments. The monuments could have been

Continued…

36

Indeed, the *Vawter* court rejected the related argument that, for vanity plate messages to be government speech, one would have to reasonably believe that a person who saw the vanity plate "BIGGSXY," FOXYLDY," or "BLKJEW"—all actually existing Indiana vanity plates—would think that the State of Indiana was making the assertion. The court's explanation was that the *Walker* "majority held that all of Texas' specialty plates are government speech," and that vanity plates "do not cease to be government speech simply because some observers may fail to recognize that [the] alphanumeric combinations are government issued and approved speech in every instance." *Id.* at *4. "[A] few exceptions do not undermine the conclusion that [vanity plate messages] are government speech." *Id.* (footnote omitted). The problem with this reasoning is that vanity plate messages that do not appear to be coming from the government are the rule, not the exception.

We return to Mitchell's vanity plates. As noted, he applied for and obtained the vanity message "MIERDA" displayed on the commemorative Agricultural Plate, which is an alternative to the standard base Plate. Mitchell acknowledges that, under *Walker*, the scenes depicted on the Agricultural Plate and the words "*Our Farms, Our Future,*" at the bottom of the plate, are government speech. He argues that just because his

---

…continued
identical, or could have expressed identical concepts (*e.g.,* peace, or commemoration of veterans), and they still would have been a mode of government speech under the Supreme Court's analysis.

personalized vanity message appears on a license plate that contains government speech it does not make his vanity message government speech. We agree.

Maryland's commemorative plates simply are alternative base license plates that vehicle owners may purchase for a price. They are similar to the base license plates of many States that display scenes, slogans, or other depictions about the State. When a vanity plate message appears on a base plate or commemorative plate, the unique, personalized message about the vehicle's owner ("BOB") is distinct, and obviously so, from the government message ("*Our Farms, Our Future*," or "*Treasure the Chesapeake*"). Although it is reasonable to assume that the owner of a vehicle that bears a commemorative license plate endorses the government message the plate expresses (otherwise why pay extra for it?), the converse is not the case. It is no more reasonable to assume that a personal vanity plate message is endorsed by the State when it appears on a commemorative plate than when it appears on a standard base plate. Again, private speech does not become government speech merely because it takes place on government property, and that is true even where other, government, speech also is taking place there. *See Matwyuk*, 22 F. Supp. 3d at 823–824. *See also Walker*, 135 S. Ct. at 2242; *Perry v. McDonald*, 280 F.3d at 166; *Int'l Soc'y for Krishna*, 505 U.S. at 678.

**(e)**

Having concluded that vanity plate messages are not government speech, we turn to the forum doctrine to resolve the First Amendment issue. We first determine whether vanity plates are a public forum or a nonpublic forum. We then apply the standard by which government restrictions on speech in that forum is assessed to decide whether the

38

State violated Mitchell's constitutional right to freedom of speech when it recalled his "MIERDA" vanity plates.

## Are Vanity Plates a Public Forum?

The parties agree, and it is beyond dispute, that vanity plates are not a traditional public forum. In his opening brief, Mitchell argues that vanity plates are a "limited public forum." In his reply brief, he seems to take the position that they are a "designated public forum." Whichever is the case, he maintains that, by enacting legislation permitting vehicle owners to display "personalized messages" on license plates, *i.e.*, to obtain vanity plates, the State created a forum for free expression by members of the public.

The State counters that, if vanity plate messages are not government speech, then "vanity plates constitute a nonpublic forum." It relies upon *Perry v. McDonald*, 280 F.3d 159, in which the Second Circuit applied the forum doctrine to hold that vanity plates are a nonpublic forum.[29]

Before discussing *Perry v. McDonald*, we shall examine three seminal Supreme Court forum doctrine cases on the distinctions between a public forum and a nonpublic forum.

---

[29] Mitchell argues that we should not look to *Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001), in analyzing whether vanity plates are a public or nonpublic forum because the Fourth Circuit clearly has held that vanity plates are a public forum. He is incorrect. Every case he cites to support this assertion concerns specialty plates, not vanity plates. There are no Fourth Circuit cases that even address whether a vanity plate is a public or nonpublic forum.

In *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983), the forum in question was the internal interschool mail system, including teachers' mailboxes, for the Perry Township public schools. Perry Education Association ("PEA") was elected the sole bargaining representative for the teachers' union. Under a collective bargaining agreement, the Board of Education ("Board") gave PEA access to the mail system. Other, rival, teaching organizations were not given access. Perry Local Educators' Association ("PLEA"), one such organization, filed suit against PEA and certain Board members, alleging that they were violating its First Amendment right to free speech by denying it access to the mail system. PLEA argued that the mail system was a limited public forum, and no compelling government interest was served by restricting its access to it. PEA and the Board members took the position that the mail system was a nonpublic forum, and the restriction on access was reasonable.

The federal district court entered judgment for PEA. The Seventh Circuit Court of Appeals reversed, holding that, having opened its mail system to PEA, the Board violated PLEA's First Amendment right to free speech by denying it equal access to the system. The Supreme Court granted a petition for writ of *certiorari* and reversed.

The Court held that the mail system was a nonpublic forum. It explained that when a government intentionally opens a government property for use for expressive activity by the general public, it creates a public forum and is bound by the same speech-restricting standards that apply in a traditional public forum, even if it had no obligation to create the public forum to begin with. The Board's intended purpose in establishing the mail system was to facilitate internal communication of school related matters to

40

teachers, not to provide a communication channel for the general public. Indeed, the mail system never had been open to the general public. The practice always had been that any outside entity wanting access to the mail system had to seek permission from the individual building principal. "This type of selective access does not transform government property into a public forum." *Perry Educ. Ass'n*, 460 U.S. at 47.

Because the mail system was a nonpublic forum, the reasonableness standard applied to the restrictions on its use. The Court concluded that the differential access to the mail system was reasonable, because it enabled PEA to effectively perform its duties as the exclusive bargaining representative for all Perry Township teachers.

Two years after deciding *Perry Education Ass'n*, the Supreme Court revisited the forum doctrine in *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788 (1985). That case concerned a charity drive, aimed at federal employees, that was held each year in a federal government workplace, during work hours. Representatives of various non-profit health and welfare charities participated, displaying information about themselves, handing out literature, and soliciting contributions from the federal employees in attendance. By Executive Order, as implemented by the Director of the Officer of Personnel Management, charitable organizations whose purpose was to attempt to influence public policy through political activity, advocacy, lobbying, or litigation were not permitted to participate.

In a suit in federal court, a number of excluded organizations challenged the government restriction against their participating in the charity drive. They argued that the charity drive was a limited public forum, and the federal government was violating

41

their First Amendment rights by excluding them without a compelling government interest. Ultimately, the case reached the Supreme Court.

The Court identified the forum in question as the charity drive, not the federal workplace generally. It observed that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802. To determine the government's intention in creating the forum, the Court looked to the policies and practices of the program, the nature and character of the property, and whether the property was compatible with expressive activity. From the program's inception, the practice had been to limit the participating charities to health and welfare organizations not involved in political activities, lobbying, and such. That practice suggested that the government did not intend to create a public forum for expressive activity. The nature of the property also militated against any such intention. Like most workplaces, the federal workplace exists to accomplish the business of the employer. And, although the program was not incompatible with expressive activity, the fact that that activity took place there did not imply that the program was a public forum. The Court held that the charity drive was a nonpublic forum and that the restrictions imposed were reasonable.

Finally, in 1992, in *International Society for Krishna Consciousness, Inc. v. Lee*, the Supreme Court held that an airport terminal owned and operated by government authorities is a nonpublic forum for First Amendment purposes. In that case, the Port Authority of New York and New Jersey adopted regulations prohibiting the solicitation of contributions and the distribution of literature at its three airports. The International

42

Society for Krishna Consciousness, Inc. (known as "ISKCON"), brought a declaratory judgment action challenging the regulations as violating its First Amendment right to free speech. Ultimately, the Supreme Court rejected the challenge, in part, concluding that the airport terminals were nonpublic fora in which speech by private citizens could be restricted by the government if the restrictions were reasonable and viewpoint neutral. The Court held that it was reasonable for the Port Authority to restrict solicitation, but not distribution of literature.

We return to *Perry v. McDonald* and license plates, in particular, vanity plates. Paula Perry and her husband applied to the Vermont Department of Motor Vehicles ("DMV") for vanity plates bearing the letters "SHTHPNS," which, Mrs. Perry eventually acknowledged, stands for "shit happens." The DMV had discretion, by statute, to deny a requested vanity plate that was "'offensive or confusing to the general public.'" 380 F.3d. at 163 (quoting Vt. Stat. Ann. tit. 23, § 304(d) (2000)). At the time, the DMV followed an unwritten policy of denying, as offensive, requests for messages that included "scatological terms." (The policy later was put in writing.)

The Perrys' application was granted, and for about a month Mrs. Perry drove her vehicle with the "SHTHPNS" vanity plates. A DMV employee happened to notice her vanity plates while on the road and reported to his superiors that the plates must have been issued in error. The DMV looked into the matter and wrote a letter informing the Perrys that the plates were being recalled. Confusion about Mrs. Perry's address (she and her husband were in the process of separating) led to the DMV's entering an order revoking her vehicle's registration. Ultimately, a hearing officer ruled that the DMV

43

could not recall the vanity plates because there was no provision in Vermont law allowing it to recall license plates.

Anticipating that the DMV would refuse to issue her "SHTHPNS" vanity plates upon re-registration of her vehicle, Mrs. Perry sued the Commissioner of the DMV and a former DMV employee, in federal district court, seeking declaratory and injunctive relief and damages. She claimed she had a First Amendment right to express her "SHTHPNS" message on her vanity plates, and that any action by the DMV to prevent her from doing so would violate that right. The defendants moved to dismiss the First Amendment claim. The district court granted the motion, ruling that vanity plates are a nonpublic forum; the State may restrict speech in that forum so long as the restriction is reasonable and viewpoint neutral; and a restriction by the DMV against vanity plates that spell out, by abbreviation, profanities such as the word "shit" meets that standard.

On appeal before the Second Circuit, Mrs. Perry argued that vanity plates are a designated public forum. The court focused its forum analysis on whether, in establishing a "vanity plate regime," 280 F.3d at 167, the government "'intended to designate a place not traditionally open to assembly and debate as a public forum,'" in which people can engage in full expression and discourse, as they can do in a traditional public forum. *Id.* (quoting *Cornelius*, 473 U.S. at 802).

Applying forum doctrine principles as explained by the Supreme Court in *Perry Education Ass'n*, *Cornelius*, and *International Society for Krishna*, the Second Circuit reviewed Vermont's vanity plate policies and practices and considered the nature of vanity plates and their "'compatibility with expressive activity.'" *Perry v. McDonald*,

44

280 F.3d at 168 (quoting *Cornelius*, 473 U.S. at 802). The court took into account that Vermont's stated legislative policy for issuing license plates is to aid in vehicle identification; and its purpose in establishing a vanity plate program is to raise revenue. Neither one demonstrated an intention on the State's part to create a public forum by making vanity plates available. The court pointed out that access to vanity plates is limited and the expressive activity in which people engage on them is subject to regulation by the government, including restricting access to vanity plates when the message sought to be conveyed is offensive, as determined by the DMV. This suggested that Vermont "did not intend to designate a public forum on [its] vanity plates." *Id.* The court found that the "highly limited and extremely constrained means of expression" that vanity plates offer is inconsistent with free and full public discourse, and hence with an intention by Vermont to designate vanity plates as a public forum. *Id.* The court concluded that Vermont vanity plates are a nonpublic forum, and therefore restrictions on speech in that forum were not subject to strict scrutiny review. *Id.* at 169.

The holdings of the Supreme Court in *Perry Education Ass'n*, *Cornelius*, and *International Society for Krishna*, and the persuasive reasoning of the Second Circuit in *Perry v. McDonald*, lead us to conclude that the State of Maryland did not intend to create a public forum of any type by enacting vanity plate legislation, and that Maryland vanity plates are a nonpublic forum.

In 1904, Maryland first enacted legislation requiring motor vehicles to be registered in order to be driven on public streets. *See* Laws of Maryland, 1904, Ch. 518, as codified in Md. Code (1904), Art. 56, § 132 (effective date Apr. 12, 1904). Vehicles

45

were assigned registration numbers, and their owners were given a piece of paper bearing a number. A vehicle owner was responsible for coming up with a means to display the registration number "upon the back" of the vehicle "in a conspicuous place, so as to be plainly visible at all times." *Id.* The registration number as displayed was supposed to be by "separate Arabic numerals, not less than three inches in height, the strokes to be of a width not less than three-eighths of an inch." *Id.* In 1906, the law was amended to require vehicle owners to display the registration number on the front of the vehicle as well. *See* Laws of Maryland, 1906, Ch. 449, as codified in Md. Code (1904), Art. 56, § 132 (Cum. Sup. 1906) (effective date Apr. 3, 1906). Apparently, putting the burden on vehicle owners to devise their own registration number displays did not work well. In order to ensure that all vehicles would have registration numbers displayed, and thus be readily identifiable visually, the law was changed, in 1910, to require all vehicles registered in Maryland to display license plates issued by the State. This history makes clear that the purpose of the statutory mandate for license plates on vehicles registered in Maryland is identification of vehicles on the road. This policy remains, and applies to license plates of all types. The policy does not evidence any intention on the part of the State to create a forum for public discussion.

By 1971, when vanity plates became available in Maryland, they already had proven lucrative for other States. Maryland always has required payment of a fee for vanity plates; and the fees generate revenue, which is the single benefit the State enjoys from having a vanity plate program. It is evident, therefore, that Maryland's purpose in establishing a vanity plate program was, and still is, to raise money. This purpose does

46

not reflect an intention on the part of the State to create a public forum, *i.e.*, one for full and free expression of ideas by members of the public. Rather, it demonstrates an intention to tap into the egocentricities of vehicle owners, to the State's financial benefit.

Public access is a hallmark of a public forum, so the fact that the Maryland general public does not have unimpeded access to vanity plates also militates against a conclusion that the State intended to create a public forum in vanity plates. In traditional and designated public fora, members of the public have full access to the forum for indiscriminate speech; and for limited public fora, which are created when the government "reserves [a forum] for certain groups or for the discussion of certain topics," the public has full access commensurate with the purpose of the forum. *Rosenberger*, 515 U.S. at 829.

Vanity plates are not fully accessible to the public. They only may be obtained by vehicle owners, and then only by the owners willing to pay a fee. More significantly, under Maryland law a vehicle owner cannot obtain vanity plates without first being granted permission by the State (through the MVA). This always has been the case, from the time vanity plate legislation was enacted, and is inconsistent with any intention on the part of the State to create a public forum. If the State had intended to make vanity plates a public forum, it would not have conditioned access to them upon the permission of the MVA. And vanity plates are not accessible for indiscriminate speech (or even for speech on a particular topic or by a particular group, such as in a limited public forum). Rather, to obtain permission from the MVA for a particular vanity plate, the requested plate must comport with the statutory and regulatory limits on what may be displayed. This too is

47

inconsistent with the creation of a public forum. The State would not have retained for itself, through the MVA, discretion to refuse to grant a request for a vanity plate message that is a profanity, epithet, or obscenity, and for the other reasons set forth in the vanity plate statute and regulations, if its intention was to create a public forum.[30]

Finally, we agree with what the *Perry v. McDonald* court deemed an "obvious conclusion" – that the nature and character of vanity plates make them "an unlikely means by which to engage in meaningful 'assembly and debate' or other expressive activity." 280 F.3d at 168 (citations omitted). "Because vanity plates are physically restricted by size and shape and by the state's interests, including that of vehicle

---

[30] In *Vawter*, the Indiana Supreme Court, having concluded that vanity plate messages are government speech, proceeded nevertheless to consider whether vanity plates are a public forum or a nonpublic forum, as the *Walker* Court did with respect to specialty plates. The *Vawter* court concluded that vanity plates do not fit within the forum doctrine and, in particular, are not a nonpublic forum. Its reasoning is circular. The court observed that a nonpublic forum exists when the government is managing its property, and that property is used for private speech; but where the government is using its property for government speech, "that government speech necessarily crowds out all private speech on the same property," and therefore the property is not a nonpublic forum. *Vawter*, 2015 WL 6777765, at *6. This reasoning *assumes*, in deciding whether the government is speaking, that the government *is* speaking.

In addition, the *Vawter* court's reasoning is based on a misunderstanding of the *Perry Education Ass'n* case. The court in *Vawter* points out that, in *Perry Education Ass'n*, a government mail system was used to transmit official messages, personal messages, and messages from private organizations. On that basis, it concludes that when government speech and private speech take place on the same government property, the government speech "crowds out" the private speech and the forum is *not* a nonpublic forum. *Vawter*, 2015 WL 6777765, at *6. That is precisely the opposite of the Supreme Court's holding in *Perry Education Ass'n*. The Supreme Court held in that case that the mail system was a nonpublic forum - - not that it was government speech, or that any government speech taking place in the forum "crowded out" the private speech taking place in the forum.

48

identification, vanity plates are a highly limited and extremely constrained means of expression." *Id*. Of course, one cannot underestimate the capacity of human beings to be pithy; and if that talent does not come naturally, the internet is chock full of websites with letter and number message combinations. *See*, *e.g., leetspeak*, Netlingo (2015), http://www.netlingo.com/word/leetspeak.php; *Staff Picks*, COOLPL8Z.com (2005), http://www.coolpl8z.com/staff-picked-best-custom-license-plates.php. Nevertheless, a terse seven character vanity plate message that is viewed by many but cannot be meaningfully answered or commented upon is not the kind of full expressive activity that takes place in a public forum.

In short, in Maryland, license plates are State property that the State regulates so they will serve their primary purpose of identifying vehicles. For a fee, and with the permission of the MVA, vehicle owners may choose the combination of letters and numbers that will appear on their license plates. Like the mail system in *Perry Education Ass'n,* the charity drive in *Cornelius*, and the airport terminals in *International Society for Krishna*, this vanity plate program is not a forum created by the State for access by the public for full and free expression of ideas. It is a revenue producing program by which vehicle owners, with advance approval of the State, may engage in limited expression on government owned and regulated property. The Supreme Court in *Cornelius* made clear that the government does not create a public forum by permitting limited discourse on government property, which is the case with vanity plates. Accordingly, Maryland vanity plates are a nonpublic forum.

49

**Is the MVA's Prohibition Against Profanities on License Plates, Including Vanity Plates, Reasonable and Viewpoint Neutral, as Applied in This Case?**

"Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose of the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806.

Mitchell contends that even if vanity plates are a nonpublic forum, the MVA violated his First Amendment right to free speech by recalling his "MIERDA" vanity plates, because doing so was not reasonable and viewpoint neutral. Not surprisingly, the State takes the contrary view.

In *Perry v. McDonald*, after determining that vanity plates are a nonpublic forum, the Second Circuit addressed whether Vermont's policy of denying vanity plates requesting offensive terms, including scatological terms, violated Mrs. Perry's First Amendment right to free speech. It concluded that the policy was reasonable and viewpoint neutral. The court reasoned that because "license plates are governmental property intended to serve a governmental purpose," they "will be associated with the state that issues them"; therefore the State has "a legitimate interest in not communicating the message that it approves of the public display of offensive scatological terms on state license plates." *Perry v. McDonald*, 280 F.3d at 169. The policy served that legitimate State interest. In addition, it was not directed at suppressing speech – Mrs. Perry remained free to place a "SHTHPNS" bumper sticker on her vehicle – but at disassociating the State from the speech. Accordingly, Vermont's policy precluding

vehicle owners from obtaining vanity plates bearing offensive scatological terms, such as "shit," was reasonable.

This analysis applies to Maryland's restriction against profanities (and obscenities and epithets) on vanity plates as well, and remains viable after the Supreme Court's *Walker* decision. For the reasons we have explained, the personal nature of a message on a vanity plate makes clear that the vehicle owner, not the State, is speaking. Nevertheless, license plates are government property and IDs for vehicles, and vanity plate messages only may be obtained by a vehicle owner with the permission of the State, through the MVA. Although people who see a vanity plate bearing a profanity will not think that the profanity is the State's message, they *will* think that the State has deemed the message acceptable for display to the public at large, including to children. As the *Perry v. McDonald* court observed, the State has a legitimate interest in *not* communicating *that* message. *Id.* And the most effective way of advancing that interest is to preclude vanity plates bearing profanities, epithets, or obscenities. Maryland's restriction is reasonable, and was reasonably applied in this case.

The *Perry v. McDonald* court also concluded that Vermont's policy prohibiting offensive scatological terms on vanity plates was viewpoint neutral. The court explained:

> [T]he government may reasonably restrict expressive activity in a nonpublic forum on the basis of content, but not on the basis of the speaker's viewpoint. For instance, a state might be permitted to prohibit speech on scatological subjects, but it may not be able to prohibit expression of particular views about such subjects.

*Id.* at 170 (internal citations omitted). This reasoning likewise applies to the MVA's regulation against profanities, epithets, and obscenities on vanity plates. The regulation

51

does not discriminate against expressive activity based on viewpoint. It restricts expressive activity based on subject matter.

Finally, Mitchell asserts that the restriction as applied to his vanity plates was unreasonable and was not viewpoint neutral because the word "mierda" has several meanings, some of which are not profane. We disagree. Mitchell acknowledged that "mierda" is Spanish for "shit," a profanity, and there was other evidence that the word is used as a profanity. Indeed, Mitchell's example of another meaning for the word – "good for nothing" – still is the use of the word as a profanity. If, as Mitchell maintained, he was using the word to mean "compost" and was advocating that "we ought to go more with the earth and the compost," there is no explanation for why he did not apply for vanity plates with the word "EARTH" or "COMPOST," neither of which is a profanity.

In *Kahn v. Department of Motor Vehicles*, the petitioner, a court reporter, obtained vanity plates which read: "TP U BG." 16 Cal. App. 4th at 162. After she had used the plates for years, a member of the public complained about them, saying that in "stenographic shorthand TP = F [and] BG = CK"; so with the "U" between them, they spelled "F" "U" "CK." *Id*. The petitioner acknowledged that her vanity plates were based on court reporting shorthand, but maintained that the shorthand actually translated into the phrase "if you can" and that she did not know it could have another meaning. *Id*. (Apparently, the meaning of the phrase varied depending upon the number of keystrokes used to produce it and its context.) The Department of Motor Vehicles cancelled her vanity plates because they violated its regulation against vanity plates that carry "connotations offensive to good taste and decency." *Id.* at 168.

Ultimately, the cancellation was upheld by the California intermediate appellate court. The petitioner argued, in effect, that her vanity plates were not offensive because not everyone who would see them would understand them to have the offensive meaning. Not persuaded by that argument, the court commented:

> This is the equivalent of arguing that, in order to be rejected as a license identification symbol, "puta" must be understood as offensive in that form by all those who know no Spanish and thus cannot translate it as "whore." Is a word any less offensive because only 1 percent or ½ percent of the state's population know the language in which it is expressed? To have a "connotation[] offensive to good taste and decency . . . a word need not be understood in that manner by every addressee. The test is what people of ordinary intelligence (who know the language in question) would understand from the use of the word.

*Id*. at 170. The evidence before the agency showed the number of licensed and unlicensed court reporters in California and that there was a "sizable number" of other people who understand that shorthand. *Id*. Thus, there was a "significant audience for the offensive meaning" into which the phrase can be translated. *Id*.

The same reasoning applies in the case at bar. There may be some people who will see the word "mierda" on Mitchell's vanity plates and think the word is a reference to "compost" or "trash" that is not profane. There may be some people who will not have any idea what it means. There was substantial evidence, however, that people of ordinary intelligence who know Spanish will understand the word to be the profanity "shit." There was no dispute that Maryland's population includes a significant audience of

53

people of all ages who understand Spanish.[31]   The restriction against profanities on license plates, as applied by the MVA to Mitchell's "MIERDA" vanity plates, was reasonable and viewpoint neutral.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

[31] Based on 2010 census data, the U.S. Census Bureau estimated that 9.3% of Maryland's population was "Hispanic or Latino" in 2014.  U.S. Census Bureau, *State & County QuickFacts:    Maryland*,    Census.gov    (Oct.    14,    2015) http://quickfacts.census.gov/qfd/states/24000.html.